The AMERICAN OIL COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 13879.

United States Court of Appeals
Seventh Circuit.

Nov. 19, 1963.

Hammond E. Chaffetz, Chicago, Ill., Frederick M. Rowe, Washington, D. C., Walter T. Kuhlmey, Chicago, Ill., James M. Johnstone, Washington, D. C. (Richard J. Farrell, Ernest L. Godshalk, James K. Eagan, Jr., Robert D. Mitchell, Chicago, Ill., Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel), for The American Oil Co.

J. B. Truly, Asst. Gen. Counsel, Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., James McI. Henderson, Gen. Counsel, David B. Morris, Washington, D. C., Atty., Federal Trade Commission, for respondent.

Before CASTLE, KILEY and SWYGERT, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court on the petition of The American Oil Company (hereinafter referred to as American) for review [1] of a cease and desist order

1. Review is sought pursuant to 15 U.S.C.A. § 21.

issued against it by the Federal Trade Commission, respondent, following a hearing on a complaint charging American with violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. (15 U.S.C.A. § 13(a)).[2]

The Commission found[3] that American had engaged in discriminatory pricing practices in connection with the sale and distribution of gasolines to its dealer-customers in and around Smyrna and Marietta, Georgia, by selling such gasolines to certain of its customers at higher prices than it did to other customers, and that the discriminations in price had the effect on customer competition proscribed by the statute. The Commission rejected American's affirmative Section 2(b) defense[4] that any lower price to any dealer in the area was made in good faith to meet an equally low price of a competitor. Also rejected was American's claim that any differences in its prices were the result of price changes in response to changing conditions affecting the market for or the marketability of the goods concerned.[5]

The record discloses that American is engaged in the sale and distribution of gasoline and other products in twenty-five states and in the District of Columbia. In connection with its business in the State of Georgia, American has entered into contracts with service station operators pursuant to the provisions of which it sells and delivers its "Amoco" and "American" gasolines, according to the dealer-customers' requirements and orders. Ten of American's dealers are located in and around the vicinity of Smyrna and Marietta, Georgia. American's pricing practices in the sale of gasoline to these ten customers during a seventeen day period only is here involved. This period extended from October 10 to 28, 1958, and coincided with a gasoline price war in Smyrna.

Smyrna and Marietta are adjoining cities located approximately fifteen miles northwest of Atlanta, Georgia. Their common border consists of contiguous residential communities. Marietta is north of Smyrna. There are two main north-south highways in the Smyrna-Marietta area—State route 3 and U. S. route 41. State route 3 is the main highway from Marietta south to Smyrna which connects both cities with the Lock-

2. 15 U.S.C.A. § 13(a) provides in pertinent part: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *."

3. On American's appeal from the examiner the Commissioner filed an opinion in which it modified the initial decision of the examiner, then adopted it as its own, and issued the order brought here for review. Commissioner Elman dissented from the majority ruling.

4. Section 2(b) of the statute (15 U.S.C.A. § 13(b)) provides in pertinent part: "Provided, however, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price * * * to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor * * *."

5. This defense was asserted under the following proviso to Section 2(a): "And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

heed Aircraft Corporation plant and Dobbins Air Force Base. Also located on State route 3, in the heart of Smyrna, is a large shopping center patronized by inhabitants of the Smyrna-Marietta area. U. S. route 41 is a four lane highway running somewhat parallel to and about two miles east of route 3. It is a main arterial route between the mid-western states and Florida. The aircraft plant and the airforce base are located between the two highways.

For the purpose of gasoline pricing the Smyrna-Marietta area was divided into two areas. Area #1 or Smyrna area included generally the City of Smyrna and the areas to the south. Four of American's customer-dealers were located in this area. Area #5 or Marietta area included the City of Marietta and certain of American's dealers located to the south of Marietta and to the east of Smyrna on U. S. 41. Six of American's dealers were located in this area. The pattern of traffic flow between the two cities, and to and from the industrial plant, airforce installation and the shopping center, was such that local motorists had ready access to most of the American dealers located in either of the pricing areas.

In establishing the prices its dealers are to pay for gasoline, American quotes a tank wagon price. In addition, as conditions may require, American establishes a competitive price allowance (CPA) which it grants to its dealers in the predetermined area. Accordingly, as the "CPA" increases the price paid by the dealer for the gasoline decreases. Dealer's pump prices to their patrons are based on the net price afforded them by American, their supplier. Generally the dealers maintain a gross margin of profit of five cents per gallon. Thus the amounts of all price differences either in the purchase price or the resale price are measured by the amount of the "CPA" or discount extended to the dealers.

A summary of the extent of the price discriminations favoring American's Smyrna dealers, as contrasted to its price to Marietta area dealers, during the seventeen day period involved, shown in cents per gallon, follows:

| Day | Date | Discrimination in favor of Smyrna Dealers |
|---|---|---|
| Fri. | 10/10 | 0.0 |
| Sat. | 10/11 | 3.5 |
| Sun. | 10/12 | 3.5 |
| Mon. | 10/13 | 3.5 |
| Tue. | 10/14 | 6.0 |
| Wed. | 10/15 | 8.0 |
| Thu. | 10/16 | 8.0 |
| Fri. | 10/17 | 10.0 |
| Sat. | 10/18 | 7.5 |
| Sun. | 10/19 | 7.5 |
| Mon. | 10/20 | 8.5 |
| Tue. | 10/21 | 11.5 |
| Wed. | 10/22 | 5.0 |
| Thu. | 10/23 | 5.0 |
| Fri. | 10/24 | 5.0 |
| Sat. | 10/25 | 5.0 |
| Sun. | 10/26 | 5.0 |
| Mon. | 10/27 | 5.0 |
| Tue. | 10/28 | 0.0 |

American's price reductions were made in response to a gasoline price war which originated in Smyrna when on October 10, 1958, the operator of a major-brand station (Shell) posted a pump price meeting that of a station (Paraland) selling an "unbranded or private brand gasoline". The Paraland station was located one block south of the Shell station on the northern outskirts of Smyrna. It had just commenced operations. Thereafter stations in the vicinity selling other "major brands" (Texaco, Sinclair and Gulf) lowered their prices to match those of the Shell station. The Paraland station was located immediately to the rear of an American station operated by George Hicks. As the retail prices of gasoline dropped Hicks and the other American Smyrna area dealers, with the assistance of a greater "CPA" than American extended to Marietta area dealers, also lowered their retail price. In lowering its price to the favored Smyrna dealers, American matched a pre-existing price reduction of at least one of the other major brands. And, in each instance, American first verified that its dealer's

nearby rival major-brand stations were receiving price assistance from their suppliers.

The price war ended October 28, 1958, and the prices of all competitors returned to higher levels. American's "CPA" in the areas involved was then uniform.

Before proceeding to examine the evidence upon which the Commission bases its conclusion that American's discrimination in price between its Smyrna area and Marietta area dealers had the effect on customer competition proscribed by Section 2(a) we turn to consideration of the issue or issues which that examination must resolve.

American states that the principal legal issue presented for determination is whether "substantial 'injury' to competition within the meaning of Section 2(a) was caused by American's" price reductions granted to Smyrna area dealers but not to Marietta area dealers. American characterizes as subsidiary issues (1) whether the reductions, in any event, "were 'made in good faith to meet an equally low price of a competitor', and hence legally justified under the statutory 'meeting competition' proviso" and (2) whether the reductions "were granted in response to 'changing conditions affecting the market for' gasoline, and thus vindicated by the Act's 'changing conditions' proviso". In addition, American contends that irrespective of the merits, the Commission's order is defective as too broad and sweeping in scope.

■ From our analysis of the contentions advanced by American and the Commission we find that the major issue presented for our determination in this review is whether the Commission's finding and conclusion that American's discriminations in price between its customers had the adverse effect upon customer competition proscribed by Section 2(a) is supported by substantial evidence on the record considered as a whole and represents the application of the correct legal criteria.

■ The adverse effect upon competition requisite to establish the Section 2(a) violation with which the Commission has here charged American is that the price discrimination creates a reasonable probability of substantial injury to competition—such an injury as will with reasonable probability substantially lessen the ability of the unfavored dealers to continue to compete. Price discrimination does not per se constitute a violation of Section 2(a). Anheuser-Busch, Inc. v. F. T. C., 7 Cir., 289 F.2d 835. The price discrimination, no matter if substantial, must in the particular factual situation involved be capable of raising a reasonable probability of substantially lessening ability to compete. The protection intended to be afforded by the statute is directed to the preservation of competition. The statute's concern with the individual competitor is but incidental. Price discrimination which shifts business between competitors in a "second line" case such as this, where competition at the customer level is involved, is, of course, a matter with which the statute is concerned. But in addition to competitors, price discrimination, and the fact of a shift of some business from or other adverse economic effect upon the unfavored customers, it is essential to the establishment of the violation here charged that there be a causal relation between the price discrimination to the favored customers and the factor relied upon as evidencing an actual or reasonably probable substantial lessening of ability to compete on the part of the unfavored customers.

In the instant case not only was the actual economic loss sustained by the unfavored Marietta dealers during the Smyrna price war slight, but there is a lack of any substantial evidence to support a conclusion that this temporary and transient limited economic impact was the result of American's discriminatory price reduction to its Smyrna dealers, much less that it constituted a probable threat to the ability of the Marietta dealers to continue in competition. The record discloses no basis for a conclusion that there was a likelihood of any substantial impairment of the "vigor or

health of the contest for business" between American's competing dealers. And that is the competition which is sought to be protected by the statute in the context of the situation here presented. Cf. Anheuser-Busch, Inc. v. F. T. C., 7 Cir., 289 F.2d 835, 840, and authorities there cited.

The gasoline price war in the Smyrna area attracted patrons from the Marietta area. There is testimony that there was a preference on the part of some motorists for American's gasolines, but only "if the price differential was not too great". And with respect to all major brands of gasoline the retail price differential between the two communities during the period here involved was such that it strains credulity to expect that customer loyalty and brand preference would have retained for American's Marietta dealers all of their patrons and their usual volume of business during the seventeen days of price cutting in the adjoining area.

And, as the evidence hereinafter summarized discloses, there is nothing to indicate that American's temporary price reductions, although discriminatory, precipitated any reasonable probability of a substantial lessening of ability on the part of the unfavored Marietta area dealers to continue to compete. Nor is such relatively minor and temporary loss of business as is disclosed shown by substantial evidence or reasonable inference to have been the result of American's conduct.

Anderson, one of the six unfavored Marietta American dealers, operated a combined grocery store and service station on State route 3. His station was located approximately one and one-quarter miles north of favored Smyrna area dealer Hicks' station. There is evidence which supports a conclusion that the reduction in the volume of Anderson's gasoline sales during the period of the Smyrna price war represented a loss of gross profit to him of as much as $150.00. Smith, an unfavored Marietta area dealer, located about one-half mile north of Anderson, experienced a reduction in gallonage sold as compared with the equivalent periods in 1957 and 1959. But, on the figures and percentages shown by the record any loss of gross profit during the period to which the Commission points would be slight. Marietta dealer Hitt, who was located about five miles from Hicks—further north on route 3, testified that although "he might have lost some" business during the Smyrna price war period he "never complained about it." One of Hitt's patrons testified that during the price war he bought gasoline— 12 or 14 gallons—from Hicks five or six times because of the cheaper price. Two other patrons of Hitt bought gasoline in Smyrna during the price war but neither the quantity of their purchases nor whether they patronized Hicks or any of the other three favored American dealers in the Smyrna area is disclosed.

American's Marietta area dealers Seagraves, Morris and Raines, who also were not afforded the higher "CPA's", were located on or near U. S. Highway 41. Seagraves was closest to Smyrna, approximately two and one-half miles away. He had just opened his station for business on October 1, 1958. He testified that during the price war in Smyrna he felt his business "slacking up each day" and that patrons were asking him when his price was going to come down, but that after October 15, 1958, when American increased his "CPA", he lowered his price and "business went to picking back up". Morris was located approximately one and one-half miles north of Seagraves. He testified that most of his business was transient but that the "locals" complained that his price was "higher than other people who had the same gasoline down the road". His sales dropped approximately 1,000 gallons during October 1958. This would represent a loss of about fifty dollars gross profit. Raines was located approximately two miles north of Morris. He testified that the Smyrna price war affected his business "to a certain degree". Some of his patrons told him that they were buying gasoline at the cheaper price in Smyrna. He estimated that his business during the

price war period was reduced "$500.00 overall in all business". What this may have represented in loss of profit is not shown.

Thus, whatever injury to ability to compete, whether actual or probable, as is shown by the record, was not only minimal but there is no substantial evidence to show that it was the result of American's price reductions to its Smyrna dealers rather than for the most part attributable to the fact that the major brands of gasoline were being sold in the Smyrna area for substantially less than in the Marietta area. American's dealer assistance in the Smyrna area in the form of increased "CPA's", higher than those extended to its Marietta area dealers, was the result of such condition not the cause of it. The record in this case does not afford a substantial basis upon which to attribute to American's conduct a reasonably probable substantial injury to competition.

The record here does not present that inherent capability of lessening competitive ability as was evidenced by the discriminatory pricing system in F. T. C. v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196, which gave buyers of large quantities a built-in, routine and permanent price advantage over smaller rivals. Corn Products Refining Co. v. F. T. C., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320, also relied upon by the Commission, involved a systematic price discrimination based on "phantom" freight charges and geographic factors which carried a like inherent threat of substantial impairment to competition. In E. Edelmann & Company v. F. T. C., 7 Cir., 239 F.2d 152, the price discriminations were in the form of continuing differentials favoring larger purchasers over smaller purchasers without cost justification for such systematic pricing practices—a situation comparable to Morton Salt. In F. T. C. v. Sun Oil Co., 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466, the issue of substantial injury to competition was not involved. Such an injury was conceded (371 U.S. 505, 511–512, 518, 83 S.Ct. 358, 9 L.Ed.2d

466). Sun Oil is not apposite to the issue here under discussion.

In arriving at the conclusion that American's conduct had an effect on customer competition proscribed by Section 2(a) the Commission appears to have substituted the factor of the substantiality of the temporary price discrimination—the substantial price differential between the favored and the unfavored dealers—for the substantial injury to competition, actual or reasonably probable, requisite to the establishment of the violation charged.

Pertinent here is the observation made in F. T. C. v. Sun Oil Co., 371 U.S. 505, 527, 83 S.Ct. 358, 370–371, 9 L.Ed.2d 466 (citing Commissioner Elman's dissenting opinion in this case) that:

> "In appraising the effects of any price cut or the corresponding response to it, both the Federal Trade Commission and the courts must make realistic appraisals of relevant competitive facts. Invocation of mechanical word formulas cannot be made to substitute for adequate probative analysis."

In reaching the conclusion we have we do not mean to imply that a showing of intended permanency of the price discrimination is necessary to establish a Section 2(a) violation. But there must be something more than an essentially temporary minimal impact on competition and probative analysis must reveal a causal relation between the price discrimination and an actual or reasonably probable injury to competition in the context of the factual situation involved.

In view of our conclusion that the record fails to disclose the requisite substantial injury to competition we need not consider the contentions made with respect to the additional issues American raises.

The order of the Commission is set aside and the Commission is directed to dismiss the complaint.

Order set aside.