RELIABLE TIRE DISTRIBUTORS, INC.

v.

The KELLY SPRINGFIELD TIRE COMPANY and Bobby Unser and The Barnes Tire Company, Inc.

Civ. A. No. 74–3823.

United States District Court, E.D. Pennsylvania.

March 9, 1984.

Walter M. Phillips, Jr., Philadelphia, Pa., for Barnes Tire Co., Inc.

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for Kelly Springfield Tire Company.

Francis P. Devine, III, White & Williams, Philadelphia, Pa., for Tire Distributors, Inc.

Samuel L. Spear, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for Bobby Unser.

Bruce Barnes, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHAPIRO, District Judge.

## I. FACTUAL AND PROCEDURAL HISTORY

This action arises out of an agreement, dated April 20, 1972, between plaintiff Reliable Tire Distributors, Inc. ("Reliable"), a corporation engaged in wholesale tire distribution, and Sports Headliners ("Headliners"), the agent of defendant Bobby Unser ("Unser"), an internationally-known race car driver, and a second agreement, dated May 23, 1972, between Reliable and defendant Kelly Springfield Tire Company ("Kelly"), a manufacturer and distributor of tires.

The earlier agreement provided for the registration of the "Bobby Unser" trademark and granted plaintiff[1] an exclusive license to make or have made tires bearing this trademark, and thereafter to use or sell them. Reliable was to pay royalties to Unser for each tire sold. Unser in turn agreed to use his best efforts to promote and sell the tires. The parties to this agreement were plaintiff and Headliners. Defendants Unser and Kelly joined in the agreement only to ratify the provisions regarding their respective duties.

The later agreement, between plaintiff, using its registered trade name "Speedway Products," and defendant Kelly, provided that Kelly would manufacture and supply Reliable with "Bobby Unser" tires, and specified certain terms and conditions for delivery, payment, warranties, etc. The tire molds used in the manufacture of the tires were to be supplied by Kelly; Reliable was obligated to pay for them over a three-year period. The original term of the agreement ended December 31, 1972 but was subject to renewal from year to year if no action to terminate was taken by either party. Either party could terminate on three months' notice prior to the end of the calendar year.

Together the two contracts were referred to as the "Bobby Unser" program; it provided Reliable with the exclusive right to use Unser's name to market tires that Kelly would manufacture in accordance with the requirements of Reliable.

Instead of producing tires in response to orders or sales by Reliable, as contemplated by the Kelly-Reliable agreement, Kelly manufactured large quantities of "Bobby Unser" tires at a time and held them in inventory for future sale to Reliable. As a result, by 1974 Kelly had acquired a substantial excess inventory of "Bobby Unser" tires. In February, 1974, Kelly notified Reliable of the surplus "Bobby Unser" tires and requested permission to dispose of them. By letter dated February 6, 1974, Samuel Vill, Reliable's General Sales Manager, authorized Kelly to dispose of the surplus "Bobby Unser" tires subject to certain restrictions: the parties had to mutually agree as to which tire sizes were in fact excess; Kelly had to maintain an adequate inventory in accordance with future sales estimates; Kelly had to remove the "Bobby Unser" name from the excess tires or pay a fifteen-cent (15¢) per tire royalty; and Kelly could not sell the tires in Japan, Kansas City or the West Coast of the United States, excluding San Francisco. Kelly declined to dispose of the tires in inventory on those terms. Reliable subsequently signed a letter, dated June 28, 1974, that authorized Kelly to dispose of the excess tires "without strings."

In September, 1974, Kelly contacted Reliable and offered to sell the excess inventory tires to Reliable at a discounted price if Reliable would accept immediately the entire inventory and make payment for them in full within thirty (30) days of shipment. However, Kelly would not drop-ship the tires, as it did for the Bobby Unser program. Reliable rejected that offer. Kelly

---

**1.** Vista Rubber Corporation ("Vista"), a New Jersey corporation formed by Reliable specifically for purposes of this agreement, was the original party to the Unser contract. Subsequent to the execution of the agreement, Vista assigned all of its rights, title and interest in the agreement to Reliable, and Vista was formally dissolved.

then offered to sell the tires to defendant Barnes Tire Company ("Barnes") for the same price and on the same terms and conditions offered to Reliable. Barnes also rejected such an offer, but made a counter-offer which Kelly accepted. Kelly sold the excess tires to Barnes at a price lower than the price specified in the Kelly-Reliable agreement and lower than the discounted price originally offered to Reliable, and without first reoffering the tires to Reliable. Kelly agreed to drop-ship the tires for Barnes and did not require immediate full payment for the tires. Kelly also manufactured additional "Bobby Unser" tires which were sold to Barnes in November and early December, 1974 for the same discounted price and on the same favorable terms as the excess tires. At that time, Kelly manufactured and sold tires to Reliable for prices set in accordance with the 1972 contract (which provided for a price set by Kelly each half year). Therefore, during November and early December, 1974, Kelly manufactured and sold tires to both Reliable and Barnes at different prices and on different terms.

In December, 1974, Reliable sought to purchase 30,000 tires at the Barnes price but Kelly refused to sell to them. Reliable then contacted other tire manufacturers to determine whether it could have "Bobby Unser" tires produced at lower cost elsewhere. Mohawk Rubber Company ("Mohawk") agreed to manufacture the tires for a lower price than that charged by Kelly, so Reliable requested Kelly to release the tire molds for transfer to Mohawk in the Spring of 1975. Kelly refused to release the molds; Reliable was later informed that more than $46,000 was owed Kelly for the molds. The Kelly-Reliable agreement stated that "[n]o mold will be removed from [Kelly's] plant as long as any balance remains unpaid on such mold." ¶ 17(d). Reliable declined to pay the remaining amount in advance of the due date.

The Unser-Reliable agreement provided that Unser could terminate the contract if he did not receive at least $7,500 from Reliable in any contract year. On April 23, 1975, Unser, claiming he had not received the minimum amount by the last day of the third year, April 21, 1975, sent a notice to Reliable that their agreement was terminated. Reliable received the notice on April 25, 1975. On April 28, 1975, Unser received a check from Reliable in payment of royalties due for the past contract year. Reliable claims the check was mailed on April 19, 1975, and denies Unser's right to terminate the agreement. On May 25, 1975, Kelly exercised its right to terminate its contract with Reliable upon the termination of the Unser-Reliable agreement.

Reliable's complaint charges some or all of the defendants with breach of contract, tortious interference with contract, price discrimination, trademark infringement, and antitrust violations. Reliable alleges that: Kelly and Barnes violated the Robinson-Patman Act, 15 U.S.C. § 13, by Kelly's manufacture and sale of the "Bobby Unser" tires to Barnes at lower prices than it would and did sell to Reliable; Kelly, Barnes and Unser conspired and acted in concert to restrain trade and eliminate Reliable as a distributor of tires in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Barnes and Kelly infringed Reliable's registered "Bobby Unser" trademark by the manufacture and sale of tires bearing the trademark; Kelly breached its contract with Reliable by manufacturing and selling tires to Barnes, refusing to manufacture tires for Reliable, and terminating the agreement; and Barnes tortiously interfered with Reliable's contract with Kelly by inducing the sale of "Bobby Unser" tires that were not in excess inventory but were specially manufactured for Barnes. Plaintiff and defendants filed various cross-motions for summary judgment, all of which were denied prior to trial.

## II. DISCUSSION

### A. *The Robinson-Patman Claims*

Reliable claims that Kelly violated Section 2(a) of the Robinson-Patman Act by selling Unser tires to Barnes at a lower price than that at which it sold them to

Reliable. Section 2(a) reads, in relevant part:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

The price discrimination referred to in Section 2(a) is merely a price difference. *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). "A difference in prices charged by a seller to different customers, for the same product, constitutes price discrimination." *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 346 (3d Cir.1981). However, the Act covers discrimination in price of sales made; it does not cover any refusal to sell a product, even if that refusal is discriminatory. *Shaw's, Inc. v. Wilson-Jones Co.*, 105 F.2d 331 (3d Cir.1939). Only the sale of tires to Reliable and Barnes at different prices in November and December, 1974, and not Kelly's refusal to sell to Reliable after December 1974, can be considered in regard to the Robinson-Patman Act violation.

■ Kelly sold tires of "like grade and quality" at different prices to Barnes and Reliable. However, the Act does not outlaw price discrimination *per se*, but only price discrimination which presents a reasonable probability that competition will be substantially lessened or injured. *Anheuser-Busch, supra* 363 U.S. at 542–43, 80 S.Ct. at 1270–71; *O. Hommel, supra* at 346. Reliable must show that the price discrimination in November and December of 1974 sufficiently harmed competition.

[I]t is essential to the establishment of the violation [of the Act] ... that there be a causal relationship between the price discrimination to the favored customer[ ] and the factor relied upon as evidencing an actual or reasonably probable substantial lessening of ability to compete on the part of the unfavored customer[ ].

*American Oil Company v. FTC*, 325 F.2d 101, 104 (7th Cir.1963).

■ The requisite competitive injury may either be actually shown by market analysis or inferred from predatory intent. *O. Hommel, supra* at 347. Reliable has shown neither. The evidence established that Kelly agreed to sell Barnes approximately 33,000 tires for more favorable prices than Kelly sold to Reliable. *See, International Film Center, Inc. v. Graflex, Inc.*, 427 F.2d 334 (3d Cir.1970). Here, Reliable stopped operating its "Bobby Unser" program not because Kelly sold a relatively small number of tires to Barnes at a lower price than it charged Reliable for tires of like grade and quality but because Kelly refused to manufacture any more "Bobby Unser" tires. The testimony of one customer of Reliable is insufficient to establish the requisite injury to competition. There was no testimony that Reliable itself was substantially injured by the sale of the tires to Barnes; Reliable was then and is now one of the largest wholesale tire distributors in the country.

The injury claimed really relates to Reliable's inability to sell Unser tires because Kelly refused to manufacture more tires for Reliable after December, 1974 and terminated the contract in May, 1974. This does not establish a Robinson-Patman Act violation since it does not involve discriminatory pricing. Kelly's failure to reoffer the excess inventory tires to Reliable on the same terms it gave Barnes also fails to establish a Robinson-Patman violation. Only the effect of discriminatory prices charged for the same product can be considered.

Nor do the facts indicate that an adverse effect on competition was a reasonably probable result of discriminatory pricing. The sale to Barnes was an isolated incident in connection with Kelly's need to dispose of excess inventory, *cf., Texas Gulf Sul-*

*phur Co. v. J.R. Simplot Co.,* 418 F.2d 793 (9th Cir.1969), arising out of the Kelly-Reliable dealings. Kelly did not sell the "Bobby Unser" tires at any price to anyone other than Barnes and Reliable. Reliable argues that it was unable to compete with Barnes in selling "Bobby Unser" tires because Barnes, having purchased the tires from Kelly at a lower price, could sell at a lower price than Reliable could. Reliable showed no significant loss of business because of Kelly's discriminatory pricing.

Reliable established at most that one of its customers lost credibility in the high performance tire market by selling Unser tires purchased from Reliable at a higher price than they were sold by those who purchased them through Barnes. The discriminatory pricing was an isolated incident for less than a two-month period. *See, American Oil, supra.* It originated in a need to dispose of excess inventory; even though Reliable was not responsible for the development of the excess inventory, it is clear that insufficient competitive damage has been shown. "[T]here must be something more than an essentially temporary minimal impact on competition." *American Oil, supra* at 106. "The protection intended to be afforded by the statute is directed to the preservation of *competition.* The statute's concern with the individual *competitor* is but incidental." *Id.* at 104 (emphasis added).

Reliable has not produced express evidence of predatory intent on the part of Kelly; the relevant facts negate a finding of actual predatory intent. The sale to Barnes arose from a need to dispose of excess inventory. Reliable had authorized Kelly to sell the excess tires in a letter permitting Kelly to do so "without strings." The discriminatory pricing was an isolated incident of limited duration. There is no express evidence of predatory intent. Nor has Reliable produced any evidence that Kelly priced below its average cost in its sale to Barnes so that predatory intent might be inferred. *See, O. Hommel, supra* at 347. Since predatory intent has not been established, no competitive injury can be inferred because of it.

■ Reliable has also claimed that Barnes violated Section 2(f) of the Robinson-Patman Act by knowingly inducing sale of and receiving tires at a discriminatory price. Section 2(f) provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by [§ 2(a)]." 15 U.S.C. § 13(f). Because Reliable has failed to prove a violation of Section 2(a) by Kelly, it cannot establish a Section 2(f) claim against Barnes. *See, Robinson v. Stanley Home Products, Inc.,* 178 F.Supp. 230, 234 (D.Mass.), *aff'd. on other grounds,* 272 F.2d 601 (1st Cir.1959).

B. *The Sherman Act Claim*

■ Reliable charges that Kelly, Barnes and Unser conspired to restrain trade in violation of Section 1 of the Sherman Act. The conspiracy was allegedly to eliminate Reliable as a distributor of Unser tires by flooding the market with low-priced Unser tires, refusing to sell Unser tires to Reliable, denying the use of the Unser tire molds to Reliable,[2] and fixing Unser tire resale prices at rates "unfavorable" to Reliable. Section 1 provides, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restrain of trade or commerce among the several States ... is declared to be illegal.

Reliable had to prove that: the defendants contracted, combined or conspired among each other; the combination or conspiracy produced adverse, anticompetitive effects within the relevant product market; the objects of and the conduct pursuant to that conspiracy were illegal; and it was injured as a proximate result. *Fleer Corporation v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 147 (3d Cir.1981); *Glauser Dodge Co. v.*

---

2. As noted above, Reliable had attempted to get Kelly to release the tire molds in the Spring of 1975 so that Reliable could transfer production of the "Bobby Unser" tires to Mohawk. Kelly had refused to release the molds.

*Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir. 1977). Reliable failed to produce sufficient evidence that the defendants conspired or acted in concert, so there is no need to reach any of the other elements required for a Section 1 claim.

■ "Unilateral action, no matter what its motivation, cannot violate § 1." *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 110 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Section 1 outlaws only those restraints that flow from a contract, a combination or a conspiracy. The statutory language of "contract, combination ... or conspiracy" is now considered a single concept more properly called "concerted action," to refer to parties acting in concert to achieve a common goal or plan. *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 445–46 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *See also, Sweeney, supra* at 111 ("a conscious commitment to a common scheme designed to achieve an unlawful objective"). The requirement of concerted action may be proven by direct evidence of an express agreement, *see, e.g., United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1926), but in the absence of an express agreement, concerted action may be inferred from circumstantial evidence, such as the conduct of the parties and their course of dealing. *Sweeney, supra* at 111. Reliable has the "burden of adducing sufficient evidence from which the [trier of fact] could find illegal concerted action on the basis of reasonable inference and not mere speculation." *Id.*

Reliable produced no direct evidence proving concerted action on the part of the defendants. It did not show any communication among the defendants expressly stating that the parties were joining together to eliminate Reliable as a distributor of "Bobby Unser" tires; it relied on the conduct of the defendants and the circumstances surrounding such conduct. Plaintiff relied on: Kelly's sale of the excess and specially manufactured tires to Barnes at prices lower than those paid by Reliable; Kelly's failure to reoffer the excess inventory tires to Reliable on the terms afforded to Barnes; Kelly's refusal to manufacture more tires for Reliable after December, 1974; and the subsequent termination of the agreements by Unser and Kelly. This does not persuade the court of concerted action to restrain competition.

Kelly sold the excess and specially manufactured tires to Barnes for a price significantly less and on more favorable terms than originally offered to Reliable. But Reliable did not wish to and would not purchase the excess inventory; Reliable gave Kelly permission to dispose of excess inventory "without strings;" Kelly offered the inventory to Reliable at a discount prior to offering the tires to Barnes; Reliable refused the discounted inventory and made no counteroffer; Kelly then offered the excess tires to Barnes for the same discount it had offered Reliable; and Barnes also refused the discount, but made a counteroffer which Kelly accepted. Kelly was not contractually obligated to reoffer the inventory tires to Reliable before accepting Barnes' offer. Unser was not involved in this transaction at all. Kelly's insistence on mass-production of Unser tires without regard to Reliable's requirements resulted in the excess inventory, but the court cannot conclude that Kelly and Barnes agreed to the sale of the tires in order to eliminate Reliable as a distributor of "Bobby Unser" tires.

"[T]he fact that an agreement between the [new] buyer and the ... supplier is necessarily involved does not make it an illegal conspiracy." *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 841 (2d Cir.1980). There is no evidence that Kelly planned to sell "Bobby Unser" tires to Barnes when it offered the excess inventory to Reliable. Reliable turned down a discount from Kelly for the tires without making a counteroffer. Kelly's manufacture of additional tires for Barnes was a breach of its contract with Reliable but it does not establish conspira-

torial conduct. The excess inventory tires were in unpopular sizes [3] and Barnes had refused to take the tires in inventory without the tires in additional sizes that were specially manufactured.

■ Kelly's refusal to manufacture tires for Reliable after December, 1974 also does not prove concerted action. Kelly refused to sell more tires to Reliable at the price charged Barnes but Kelly had no obligation to sell the Bobby Unser tires to Reliable at any price other than the contract price.

■ Reliable argues that the termination of the two contracts is sufficient evidence of concerted action when taken in conjunction with Kelly's previous sale of tires to Barnes. It is undisputed that Unser terminated one contract on April 23, 1975 and Kelly terminated the other on May 25, 1975 upon the termination of the Unser-Reliable agreement. Whether or not such actions constitute breach of contract, they do not, without more, establish concerted action. "The termination of contractual relations does not in and of itself implicate the antitrust laws.... It is only when such actions are 'part and parcel of unlawful conduct or agreement with others or were conceived in a purpose to unreasonably restrain trade, control a market, or monopolize [that] such conduct might well run afoul of the Sherman Law.'" *Cromar Co. v. Nuclear Materials & Equipment Corp.*, 543 F.2d 501, 510–11 (3d Cir.1976) (citations omitted). *Cf., Cernuto v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979).

Unser terminated his contract with plaintiff on April 23, 1975, three days after the end of the contract year, for failure to receive the minimum royalties under the contract. Reliable received notice of the termination on April 25, 1975; Unser received a royalty check on April 28, 1975. Kelly was notified of Unser's termination and terminated its agreement with Reliable on May 25, 1975. While the contract terminations are related in the sense that Kelly terminated because Unser terminated, that is insufficient to show concerted action. Reliable has not proved that Unser and Kelly acted in concert to terminate their respective agreements with Reliable. Unser wanted to terminate the contract because it was not sufficiently profitable for him; he overlooked the terms of the contract to do so. But the fact that one termination triggered the other does not mean that the parties conspired to cancel their contracts in order to prevent Reliable from distributing Unser tires. There was no evidence that Unser communicated with Kelly on any subject.[4]

Concerted action is sometimes established by showing that the defendants acted with particular motivation in contradiction to their own economic interest. *Sweeney, supra* at 114; *cf., Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309 (3d Cir.1975). But Reliable has not shown this. Kelly had a large excess inventory [5] that was expensive to maintain. The value of the tires was linked to the Unser name and any decline in his populari-

3. All the parties stated that the excess inventory tires were in unpopular sizes. This made the tires difficult to sell, and was a factor in Reliable's decision to permit Kelly to dispose of the inventory "without strings."

4. Barnes was involved in the execution of the original Unser-Reliable agreement as an employee of Headliners. Unser was later a minority shareholder in the Barnes Tire Company. Barnes also represented Unser informally in occasional matters. Barnes communicated with Kelly concerning the sale of the excess inventory tires, but he did so on his own behalf and not on Unser's behalf. There was no evidence of communication between Barnes and Kelly after Barnes purchased the excess inventory tires in

November and December, 1974. Those facts do not substantiate concerted action with Kelly. Kelly's sale of excess inventory tires to Barnes does not connect Kelly with Unser's termination of his contract with Reliable.

5. The inventory was over 20,000 tires. Compare this to the 30,000 Bobby Unser tires Reliable had sold all of the previous year. Of course, the inventory itself was the result of Kelly's insistence on manufacturing the tires in large lots rather than in response to number of sales, as contemplated by the Kelly-Reliable agreement. The existence of the inventory was therefore Kelly's, not Reliable's, fault. In that sense, Kelly bore the risk that an excess inventory would accrue.

ty would decrease the value of the tires. Unlike Reliable, Barnes made a counteroffer to the Kelly offer originally rejected by Reliable and Barnes. Kelly did not sell the tires below its average cost. Therefore, Kelly's disposition of the excess inventory was not against its own economic interest. Neither did Barnes act against its own interest in buying the tires at a discounted price.

Neither Unser nor Kelly acted against their own economic interests in cancelling their respective contracts. Unser's agreement was of value to him because of the royalties received each year. If he were no longer receiving royalties, it was in his economic interest to terminate the agreement in order to sell his name elsewhere. After Unser had terminated, Kelly perceived it was acting in its own economic interest by not making tires since it believed that Reliable no longer had the right to use the Unser name.

Reliable has to show both that defendants acted against their own economic interest and that they had motivation to do so. *Venzie, supra* at 1314. Because defendants' actions were in their own economic interest, there is no need to determine their motivation in acting as they did. *See, Sweeney, supra* at 114.

## C. *The Lanham Act Claim*

Reliable, as licensee of the trademark "Bobby Unser," has also charged Barnes with trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and claims a right to recover Barnes' profits derived from sales of the tires, damages sustained by lost sales and costs under 15 U.S.C. § 1117. Reliable's claim is based solely on 15 U.S.C. § 1117, which affords relief to a "registrant of a mark *registered* in the Patent Office."[6] (Emphasis added). Only a registrant is entitled to pursue the remedies afforded by this section. *Volkswagenwerk Aktiengesellschaft v. Dreer*, 224 F.Supp. 744, 746 (E.D.Pa.1963). *Cf., Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 159 (1st Cir.1977). A registrant cannot recover damages or lost profits prior to the date of registration of the mark. *City Messenger of Hollywood v. City Bonded Messenger Service*, 254 F.2d 531, 535 (7th Cir.), *cert. denied*, 358 U.S. 827, 79 S.Ct. 45, 3 L.Ed.2d 66 (1958); *Phoenix Manufacturing Co. v. Plymouth Mfg. Co.*, 286 F.Supp. 324, 328 (D.Mass.1968).

Reliable applied to the United States Patent Office for a registered mark in 1972; however, a certificate of registration was not issued until April 20, 1976, more than a year after the events in suit took place. Because Reliable was not a registrant at the time the claimed infringement occurred, it cannot recover for lost profits and damages under 15 U.S.C. § 1117.[7] *See also*, 15 U.S.C. § 1114; 15 U.S.C. § 1111.

## D. *Pendent State Claims*

### i. *Breach of Contract*

Reliable contends that Kelly breached their agreement by sale of excess inventory and other tires to Barnes in November and December of 1974, and by termination of the agreement in May, 1975.[8]

---

**6.** Reliable alleges that it had always intended to raise a Lanham Act claim against Kelly as well as Barnes. The Final Amended Complaint did not allege such a claim. But because the following discussion applies equally to any Lanham Act claim Reliable might have against Kelly, there is no need to deal with whether Reliable in fact raised the claim.

**7.** A party need not be a registrant to bring a common law infringement action. However, this cause of action is asserted under the Lanham Act rather than at common law.

**8.** Reliable also claimed that Kelly breached its agreement by refusing Reliable's request to manufacture tires in December, 1974. Kelly only refused to manufacture and sell "Bobby Unser" tires to Reliable at the discount prices offered to Barnes. Kelly was not obligated under the contract to manufacture and sell tires to Reliable at any price other than that set by Kelly in accordance with the terms of the agreement. The sale to Barnes at a price lower than the contract price was an exception permitted by Reliable's "without strings" letter of June 28, 1974. Kelly breached its agreement with Reliable by manufacturing tires for Barnes at dis-

Kelly contends it was authorized to sell the tires to Barnes by the June 28, 1974 "without strings" letter and it was justified in terminating by the termination of the Unser-Reliable contract in April, 1975.

Kelly sold excess inventory tires to Barnes and manufactured 12,000–13,000 additional tires for Barnes. The June 29, 1974 Reliable letter stating that Kelly was authorized to dispose of the excess inventory tires "without strings," permitted Kelly to sell the excess inventory to any party for whatever price and on whatever terms Kelly determined but not to manufacture additional tires, whether to round out the inventory or for any other reason. Reliable claims this "without strings" letter permitted Kelly to dispose of the inventory only through Kelly's retailers because it was intended to limit disposition to the original parties to the Unser program. Reliable did not limit Kelly's authorization to dispose of the excess inventory only through its own retailers. There is no evidence of such intent; the plain meaning of the words "without strings" is that Kelly could dispose of the inventory to whomever it wished, on whatever terms and for whatever prices it could get.[9] Kelly did not breach its agreement by selling the excess inventory tires to Barnes.

But Reliable authorized Kelly only to dispose of the *excess inventory* tires "without strings." Reliable did not permit Kelly to *manufacture* "Bobby Unser" tires for anyone but Reliable. The "without strings" letter authorized Kelly to dispose of the inventory tires as it saw fit without the contractual restrictions, but authorization to dispose of excess inventory is not authorization to manufacture additional

tires for some other party, whether or not the other party seeks to tie their non-authorized sale to the authorized sale of the excess inventory tires. The Kelly-Reliable agreement was an exclusive requirements contract under which Kelly agreed to manufacture "Bobby Unser" tires for Reliable and no one else. One of the benefits of such a contract, and part of the bargained-for consideration, is that the seller will sell to no one else. The plain language of the "without strings" letter is that Kelly could dispose of tires then constituting excess inventory; it was not leave to manufacture and sell additional Bobby Unser tires for others without Reliable's consent. Kelly's manufacture and sale of the 12,000–13,000 new tires for Barnes was unauthorized by the "without strings" letter and a breach of contract.

 Kelly also breached its contract with Reliable by its unilateral termination in May, 1975. Kelly claims Unser's termination of the Unser-Reliable agreement justified Kelly's termination of its agreement with Reliable. Paragraph 14(i) of the Kelly-Reliable agreement states that "[Reliable] shall be in default under the terms of this agreement ... [i]f [Reliable] ... fail[s] to perform any obligation due Sports Headliners, Inc. or Bobby Unser under an agreement dated April 20, 1972." Unser claimed a default justifying cancellation of his agreement on April 23, 1975 because he had not received at least $7,500 in royalties from Reliable on or before April 20, 1975, the end of the contract year. (¶ 8 of the Unser-Reliable contract).

Unser received a check from Reliable for $1,828.05 on April 28, 1975; this was the balance needed to pay him $7,500 for that

count prices, but it did not breach the agreement by refusing to sell the "Bobby Unser" tires to Reliable for other than the contract price.

9. Reliable had originally authorized Kelly to dispose of the excess inventory by letter dated February 6, 1974, but with the following restrictions: the parties had to agree which tire sizes were in fact excess; Kelly had to remove the "Bobby Unser" name from the excess tires or pay a fifteen-cent (15¢) per tire royalty; Kelly had to maintain an adequate inventory to meet future Reliable sales estimates; and Kelly could

not sell the tires in Japan, Kansas City or the West Coast of the United States, excluding San Francisco. Kelly declined to dispose of the inventory tires on those terms. The Reliable letter dated June 30, 1974 authorized Kelly to dispose of the excess tires "without strings." Since the former letter contained specific restrictions and the latter letter stated only that Kelly could dispose of the excess inventory "without strings," Reliable permitted Kelly to sell the excess tires without the restrictions for which it now contends.

contractual year so that Reliable was not in default if payment were timely made.[10] Unser claimed the payment was not made before the end of the contract year so that his termination was valid. But Paragraph 6 of the Unser-Reliable agreement specifically states that "[t]ire and tube royalties shall be paid by [Reliable] within fifteen (15) days of the close of each calendar quarter." The requirement that payment be made within a reasonable time of the end of each calendar quarter was necessary to give Reliable time to determine the amount of the royalties owed to Unser. April 20, 1975 was the close of a calendar quarter as well as the end of the contract year. Reliable had until May 5, 1975 to make the royalty payments obligatory under the contract. Unser received the royalty check on April 29, 1975 which was timely even though it is clear that Reliable did not send the check dated April 19, 1975 prior to April 28, 1975.[11]

Because Unser's cancellation of his agreement with Reliable was invalid, Kelly's termination, based solely on the prior Unser termination, was not justified. Kelly cannot rely upon improper action by another party. Under ¶ 14(i) of the Kelly-Reliable agreement, Reliable is in default if it fails to perform the Unser-Reliable contract. *See, supra* p. 137. Since Reliable had performed, Kelly's termination was a breach of contract, and Reliable is entitled to damages incurred as a result.[12]

### ii. *Tortious Interference*

█ Reliable claimed that Barnes tortiously interfered with the Reliable-Kelly contract by inducing the manufacture and sale of "Bobby Unser" tires to Barnes. Barnes knew that Kelly was obligated to manufacture "Bobby Unser" tires exclusively for Reliable. Reliable also claimed that Barnes knowingly sold the "Bobby Unser" tires at a price less than Reliable paid under the Kelly-Reliable contract.

Section 766 of the Restatement of Torts states:

**10.** The Unser-Reliable agreement entitled Unser to fifteen cents (15¢) per "Bobby Unser" tire sold by Reliable. He was guaranteed a minimum of $10,000 in royalties the first contract year, $15,000 the second contract year, and $7,500 each year thereafter. Royalties were to be paid within fifteen (15) days of the close of each calendar quarter. Reliable ordinarily made royalty payments to Unser after getting the "Bobby Unser" sales figures from Kelly. Kelly waited for total sales figures before informing Reliable of the number of "Bobby Unser" tires sold; Reliable would typically not receive these figures until after the close of the calendar quarter. The $1,828.05 royalty check received by Unser on April 28, 1975 was sent by Reliable before receiving sales figures for the calendar quarter ending April 20, 1975, and was intended to satisfy Reliable's obligation to pay Unser at least $7,500 per year in royalties. After receiving sales figures from Kelly and calculating the royalties owed Unser, Reliable sent a check for an additional $1,000 to Unser. Neither check was accepted by Unser.

**11.** Reliable's evidence that the royalty check was mailed on April 19, 1975 is not credible. The royalty check to Unser dated April 19, 1975 was the only check out of chronological order with other checks written by Reliable during that month. The check numerically preceding the royalty check was dated April 28, 1975; so was the check numerically subsequent. All other checks written by Reliable in April were in both chronological and numerical sequence. Reliable received Unser's notice of termination on April 28, 1975, the date on which the checks numerically before and after the Unser royalty check were written. Reliable's testimony that a signed check was kept separate from all the other checks in case an emergency came up and no one authorized to sign a check was present is a preposterous explanation in these circumstances.

**12.** Kelly also claims other breaches by Reliable of the Kelly-Reliable agreement to justify its termination on May 25, 1975. For example, Reliable allegedly failed to provide Kelly with monthly written estimates for tires and financial statements required by the contract. Whether or not these other alleged breaches were proved, the prior conduct of the parties established that they were not essential obligations, the breach of which would justify termination of the agreement. *See, Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637, 651 (D.N.J.1980), *Medivox Productions, Inc. v. Hoffmann-LaRoche, Inc.*, 107 N.J.Super. 47, 59, 256 A.2d 803, 809 (1969). Kelly terminated its contract only because Reliable allegedly failed to make royalty payments to Unser so that Unser terminated his agreement with Reliable; only that alleged breach was material and sufficient to justify the cancellation of Kelly's contract.

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Reliable need not show express evidence of intent; it is enough that the interference is certain or substantially certain to occur as a result of the action. *See*, Restatement (Second) of Torts Note j.

Barnes, an employee of Headliners in 1972, helped formulate the Unser program. Barnes was aware then, and at all times thereafter, that Reliable had an agreement with Kelly to manufacture "Bobby Unser" tires exclusively for Reliable. Barnes nonetheless conditioned his purchase of the excess inventory tires on Kelly's manufacture of additional tires in more popular sizes. Because Barnes was fully aware of the exclusive arrangement between Reliable and Kelly, Barnes knew and must have known that Kelly's manufacture of "Bobby Unser" tires for sale to him would require Kelly to breach its contract with Reliable.[13] Even before he bought the excess inventory, Barnes expressed an intent to interfere with the Kelly-Reliable agreement when he telephoned Samuel Vill, Reliable's General Sales Manager, in April, 1974 and stated that Reliable would not have the Bobby Unser program much longer. Barnes knew the terms of the Kelly-Reliable agreement, he insisted on newly-manufactured tires, and Barnes intended to interfere with Kelly's contractual relation with Reliable by inducing a breach by Kelly. Barnes is therefore liable to Reliable

for tortious interference with the Kelly-Reliable contract and Reliable may recover damages.

Barnes' insistence on newly-manufactured tires, not the purchase of the excess inventory tires, constitutes the tortious interference with the Kelly-Reliable agreement. Barnes could not tortiously interfere with the Kelly-Reliable agreement by purchasing the excess inventory tires, whether he intended to do so or not, because a necessary element of tortious interference is that a third person be induced not to perform a contract. Kelly's sale of excess inventory tires did not breach its contract with Reliable.

Barnes did not tortiously interfere with the Kelly-Reliable agreement by knowingly selling Bobby Unser tires (whether excess inventory or newly manufactured), at a cost below that which Reliable paid for "Bobby Unser" tires under its agreement with Kelly. The sales price of "Bobby Unser" tires did not interfere with or induce breach of the Kelly-Reliable contract. It is Kelly's sale of the specially manufactured tires that is the breach of the contract and it is Barnes' inducement of that breach that constitutes the tortious interference. Kelly would have breached its contract with Reliable, and Barnes would have tortiously interfered if Barnes never sold the tires or gave them away. The price Kelly charged Barnes for the manufactured tires and the price Barnes charged others for those tires is relevant not to the liability of Barnes but to the damages to which Reliable is entitled.[14]

### E. *Counterclaims*

██ Unser asserted three counter-

---

**13.** Reliable's "without strings" letter to Kelly authorized Kelly to dispose of the excess inventory tires, not to manufacture additional "Bobby Unser" tires for any party other than Reliable. Kelly could not rely on that letter to authorize the manufacture of "Bobby Unser" tires for Barnes and Barnes cannot rely on it to justify its interference with the Kelly-Reliable agreement. *See*, Restatement (Second) of Torts note i. Barnes was not privy to the "without strings"

letter and it was not provided to Kelly with any intent to benefit Barnes.

**14.** The price charged by Barnes for the "Bobby Unser" tires even though it occurred after the breach of contract is relevant to Barnes' intent to induce the breach of contract. But Barnes' intent is clear whether or not Barnes sold the tires at a price less than that Reliable paid to Kelly.

claims [15] against Reliable. The first counterclaim alleged that Reliable represented that it would sell at least 250,000 tires per year and that this representation induced Unser to enter into the agreement. Mr. Vill may have hoped or even expected to sell about 250,000 tires a year. But Reliable sold far less than that every year the program was in existence. Vill did not represent that Reliable would in fact sell 250,000 Bobby Unser tires every year and Unser did not rely on such a statement in entering into the contract. The contract itself provided for minimum royalties of $10,000 in the first contract year, $15,000 in the second contract year, and $7,500 in each succeeding year; it requires sales far less than the number Unser claims was an implied term of the agreement. It is the written agreement that governs the contractual relationship. However, whether or not the Unser-Reliable agreement could be added to or modified by oral testimony, Unser has not met the burden of persuading the court that such a representation of fact was made.

■■■ In his second counterclaim Unser alleges that Reliable agreed to market and promote the Unser program aggressively and that Reliable failed to do so. There is a provision in the contract relating to Unser's duties to promote and sell the "Bobby Unser" tires. But there is no provision relating to Reliable's duty to promote and market the program. The parties clearly could have written a clause as to Reliable's promotional duties had they so intended, and failure to do so, in the absence of evidence indicating differing intent, precludes finding that the parties intended to obligate Reliable to some indefinite obligation to promote and market the Bobby Unser program aggressively. Unser fails to meet his burden of proof on this counterclaim.

Unser's final counterclaim is for the royalty payments Reliable tendered after Unser terminated the agreement on April 23, 1975. There were two checks sent to Unser, one in the amount of $1,828.05 and the other for $1,000, both of which were returned to Reliable. Reliable agreed at trial that Unser was entitled to the amount of these royalty payments. Reliable is therefore liable to Unser for royalties in the amount of $2,800.

## III. CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter.

2. Kelly sold tires of like grade and quality to Reliable and Barnes at different prices but failed to prove that the effect of this price discrimination might or did substantially lessen competition or tend to create a monopoly or injure competition with Reliable, Barnes or Kelly or their customers.

3. Kelly breached its contract with Reliable not by selling excess inventory tires to Barnes but by manufacturing and selling additional tires and by terminating their agreement (the Reliable-Unser agreement not having been subject to termination by Bobby Unser at the time relied upon by Kelly). Reliable is entitled to recover from Kelly on the pendent state claim of Count I for the damages occasioned thereby.

4. Kelly and Barnes are not liable to Reliable on the Robinson-Patman Act claims of Counts II and III.

5. Plaintiff failed to prove that defendants contracted, combined or conspired to eliminate Reliable as a distributor of Bobby Unser tires; unilateral action cannot violate Section 1 of the Sherman Act. Therefore, defendants Kelly, Barnes and Unser are not liable to Reliable on the Sherman Act claims of Count IV.

6. Barnes tortiously interfered with Reliable's contract with Kelly by inducing the sale of "Bobby Unser" tires not already in excess inventory to be specially manufactured for Barnes. Therefore, Reliable is entitled to recover from Barnes on the pendent state claim of Count V for so much of Reliable's damages as are occasioned thereby.

---

**15.** Unser asserted a fourth counterclaim withdrawn at trial.

7. Inasmuch as the trial was bifurcated and Count VI deals with the relief to be afforded in the event of liability, a decision on this Count against Kelly and Unser, if not moot, is deferred to the trial on damages.

8. Reliable has failed to prove trademark infringement under the Lanham Act because it was not a registrant of a mark registered in the Patent Office at the time its claim of trademark infringement arose. Therefore, defendants Barnes and Kelly are not liable to Reliable on the Lanham Act claims of Count VII.