**SUN PRODUCTS GROUP, INC., a Washington corporation, Plaintiff,**

v.

**B & E SALES COMPANY, INC., a Michigan corporation, and Perry Drug Stores, Inc., a Michigan corporation, Defendants.**

No. 86–CV–73317–DT.

United States District Court, E.D. Michigan, S.D.

Nov. 9, 1988.

Allan M. Krass, Marshall McFarlane, Troy, Mich., for plaintiff.

Don R. Mollick, Bellevue, Wash., Jerome E. Galante, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

This is an action for patent and trademark infringement under federal law. This Court has jurisdiction over the subject matter of the instant case pursuant to 28 U.S.C. §§ 1338(a) and 1338(b), 35 U.S.C. § 271, and 28 U.S.C. §§ 2201 and 2202. Venue is proper in this district under 28 U.S.C. § 1400(b).

The trial in this matter began on January 7, 1988, and concluded on January 19, 1988. The parties have supplemented their proofs with post-trial briefs, and the matter is now ready for a decision.

The following are the findings of fact and conclusions of law of this Court pursuant to Fed.R.Civ.P. 52(a).

### I.

### A.

Steven K. Younger and Rudolph A. Fiedelak are the inventors of a foldable headrest which was given the tradename "Headchair" by them.[1] In 1983, Younger and Fiedelak formed Sun Global, Inc., a Washington corporation whose primary business activity was the manufacture and sale of the "Headchair."[2]

---

1. "The present invention concerns a foldable head rest which provides elevated support for a person's head while lying in the prone position at the beach or other leisure place, for example." Amended Patent Application, June 4, 1985, Abstract of the Disclosure at 1, Defendants' Exhibit 40.

2. Sun Products Group, Inc., the successor entity to Sun Global, was formed as a Washington corporation in mid–1986 with the primary purpose of marketing the "Headchair." Hereinafter the term "Sun" will be used to refer to either or both Sun Global, Inc., and Sun Products Group, Inc., unless otherwise specified.

Beginning on December 20, 1983, Sun conducted a "test market," or a limited sales experiment, with the "Headchair." Sun first marketed the "Headchair" in earnest in June 1984, at the Los Angeles International Gift Fair.[3] The inventors of the "Headchair" were aware of no other foldable headrest product on the American market at that time.

On October 11, 1984, Younger and Fiedelak applied, as joint inventors, for a patent of the "Headchair" as a foldable headrest. The application was rejected without prejudice by the United States Patent and Trademark Office (PTO) on the ground that the original claims were "unpatentable [for obviousness under 35 U.S.C. § 103] over Richards [U.S. Pat. No. 2,502,752] in view of Meyer [U.S. Pat. No. 4,295,571]." Report of Examiner's Action, April 24, 1985, at 2.[4]

On February 14, 1985, Sun petitioned the PTO for accelerated consideration of its pending patent application because it suspected infringement.[5] Petition to Make Special, February 14, 1985, Defendants' Exhibit 40.

An amended application was filed by Sun on June 4, 1985. On October 1, 1985, the amended application was granted, and Sun Global was issued United States Patent No. 4,544,203 ("the '203 patent") for its "foldable headrest." Plaintiff's Exhibit A.

The claimed invention of the '203 patent is described in claim 1 of that patent as follows:

1. A foldable headrest having a first opened and second folded position comprising:

(a) a first molded integral one piece rectangular frame having upper and lower parallel ends and connecting parallel side legs,

(b) a second molded integral one piece rectangular frame having upper and lower parallel ends and connecting parallel side legs,

(c) said first and said second frames having substantially equal length,

(d) said parallel side legs of said first frame having upper, lower and central portions,

(e) said parallel side legs of said second frame having upper, lower and central portions,

(f) said upper and lower portions of said parallel side legs of said first frame being spaced apart from each other substantially the same distance as said upper and lower portions of said parallel side legs of said second frame are spaced from each other,

(g) said central portions of said parallel legs of said first frame spaced apart a distance greater than said upper and lower portions of said parallel legs of said first frame,

(h) said central portions of said parallel legs of said second frame having at least a portion thereof spaced apart a shorter distance than at least a portion of said upper and lower portions of said parallel legs of said second frame,

(i) said central portion of each of said parallel legs of said first frame having an inwardly projecting key integrally molded therewith,

(j) said central portion of each of said parallel legs of said second frame having a cooperating opening therethrough for receiving a respective cooperating key of said first frame,

(k) each of said frames being resiliently flexible a distance sufficient for said respective inwardly projecting keys of said first frame to be engaged with and

---

3. Sun contends that the "Headchair" model which was introduced in June 1984 incorporated certain design changes that made the revised "Headchair" a different product, for patent law purposes, from the "Headchair" of the 1983 test market. For reasons which will be explained below, the Court does not decide this question.

4. The examiner refers to the patents listed as (a) and (h) in the list of list of prior art patents at n. 6 *infra.*

5. The possible infringers named in the Petition did not include the B & E Sales Company. Sun was unaware of B & E Sales or the "Heads–Up" product until May 1985.

 The Court finds that no alleged infringer of the '203 patent except B & E ever exerted a significant impact upon "Headchair" sales.

disengaged from said respective openings of said second frame by bowing of said first and second frames outwardly with respect to each other,

(*l*) said upper portions of the parallel legs of said first and second frames being offset laterally from said lower portions of said parallel legs of said first and second frames,

(m) each of said central portions of said legs of said first and second frames having short laterally spaced extensions and a central hub portion,

(n) said laterally spaced extensions being tangentially arranged on their respective hub portions,

(o) stop connecting means on each of said laterally spaced extensions of said central portion connected to their respective upper and lower leg portions for limiting the travel of said frames when in the open and closed positions,

(p) a first fabric panel having ends, one end being connected to said first frame upper end and the other end connected to said second frame upper end,

(q) a second fabric panel having ends, one end being connected to said first frame lower end and the other end connected to said second frame lower end,

(r) said panels being of a length so that when said frames are in said opened position, said panels will be substantially taut.

Claim 2 of the '203 patent provides as follows:

[S]aid keys of said first frame include means allowing disengagement of said keys from said respective openings of said second frame only when said head-rest is in said folded position and preventing disengagement at all other times.

The principal difference between the rejected original application and the allowed amended application was the addition of an explicit reference in the latter to (a) the "resiliently flexible" property of the one-piece headrest frames, an attribute without which the frames would be impossible to assemble, and (b) the integral key arrangement, which "eliminates the need and expense of providing separate rivets, hinge connectors or the like" for connecting the frame members to each other. Amended Application at 4.[6]

All Sun headrests, which were manufactured between October 1984 until October 1, 1985 (the date of issue of the '203 patent), bore the marking, "U.S. Patent Applied For." All Sun headrests, which were manufactured after October 1, 1985, bore the notice, "U.S. Pat. No. 4,544,203."

On March 19, 1985, Sun received U.S. Trademark Registration No. 1,325,869 on its trademark "Headchair." This registration recorded the date (December 20, 1983) when the trademark was first used, and initially entered commerce. Plaintiff's exhibit B. Sun has used the trademark "Headchair" continuously on its product since December 20, 1983.

Sun designed an advertising, trade dress and display program for the "Headchair" which included (a) the "slug line," or slogan, "The heads up way to take it easy," (b) a 24–unit shipping container which doubled as a display carton, (c) a flapless, wrapperless display package for each unit

---

6. The following twenty-three (23) patents, which are listed by patent number, refer to prior art that this Court determines to be relevant to the instant case:

(a) 2,502,752 to Richards;
(b) 3,002,201 to Nelson;
(c) 2,197,343 to Marx;
(d) 2,574,590 to Ross;
(e) 59,403 to Jouett;
(f) 116,164 to Daly;
(g) 1,209,679 to Decker;
(h) 4,295,571 to Meyer;
(i) 416,676 (Italian);
(j) 1,340,890 (French);
(k) 143,943 (Australian);
(*l*) 1,664,058 to Cable;
(m) 547,779 to Frantz;
(n) 226,453 to Kelly;
(o) 127,425 to Norton;
(p) 1,921,984 to Moore;
(q) 2,563,700 to Wolf;
(r) 278,361 to Prescott;
(s) 407,776 to Harrison;
(t) 4,063,318 to Nicholson;
(u) 3,241,160 to Escobar;
(v) 3,007,735 to Cohn;
(w) 2,697,581 to Ray.

U.S. Patent No. 547,779 that had been issued to Frantz was not considered by the patent examiner. *See* discussion *infra*.

which allowed shoppers to see, touch and handle the product directly, and (d) a distinctive graphic design on the package and shipping carton, which superimposed the product's name and associated "slug line" upon a photograph of a reclining female model in a swimsuit using a "Headchair."

Sun purchased very little commercial advertising for the "Headchair." However, the product was publicized widely by virtue of considerable exposure in the print and broadcast media. The "Headchair" was identified as one of the "Hot New Products of 1985" by People Magazine. Steven K. Younger was a guest on the national network television program "Good Morning America" on May 28, 1985. In addition, this product was the subject of feature stories in the New York Times and other newspapers. Plaintiff's Exhibit AA.

Sun sold 30,666 units of the "Headchair" between July 1984 and December 1984, and an additional 158,366 units between January 1985 and June 1985. Thus, Sun experienced a growth in "Headchair" sales of 416% between the first and second half-years of the product's presence on the market.

### B.

B & E Sales Company, Inc., is a Michigan corporation whose primary business activity is the importation and sale of merchandise, and the creation and sale of advertising, to retail drugstores throughout the United States. Perry Drug Stores, Inc., is a Michigan corporation whose primary business activity is the operation of a chain of retail drug stores in Michigan.

In July 1985, when the "Headchair" had been on the market for more than a year, B & E Sales began marketing a headrest whose design included each element, or the equivalent of each element, of claim 1 of the '203 patent. Aside from an identity in size and shape, the critical points of identification between the two devices were (a) the tautness of the opposing panels when both headrests are open (claim 1, clause "s" of the '203 patent), (b) the key and keyhole arrangement for linking the headrest frames (claim 1, clauses "i" and "j",

and claim 2), (c) the "stop connecting means" for limiting the travel of the headrests' frames when in either open or closed positions (claim 1, clauses "o" and "p"), and (d) the "resiliently flexible" property of the frames which permits one-piece assembly (claim 1, clause "k").

B & E Sales adopted the term "Heads–Up" as a tradename, but did not register that name with the PTO. It placed a slogan, "A Great Lift to Comfort," on its packaging in the same location, and with the same emphasis, as the slogan, "The heads up way to take it easy," appeared on the "Headchair" package.

The "Heads–Up" package was developed in April 1985 by an advertising agency of which two B & E Sales corporate officers were principals. B & E Sales was aware of Sun's trademark and trade dress prior to the creation of the "Heads–Up" trademark and trade dress, and used a typographical style and color scheme on its "Heads–Up" packaging which was similar to that already adopted by Sun. The display packaging by B & E Sales for its product featured a woman in a swimsuit, reclining upon a headrest, in a pose which was virtually identical to that of the woman who was featured on the "Headchair" package. As the result of a close visual inspection of the exhibits of record, this Court is convinced that the headrest which was pictured on the front and the back of the B & E Sales package is a specimen of the Sun product.

One B & E Sales newspaper advertisement, which was admitted into evidence as Plaintiff's Exhibit X, announced a sale of the "Heads–Up Head Chair." Other advertisements identified the product as the "Chair under the Head."

Sun was informed by its sales representatives of the existence of B & E Sales' "Heads–Up" product sometime before May 22, 1985. On that date, Sun's counsel sent a letter to B & E Sales concerning possible patent and trademark violations, which read, in pertinent part, as follows:

> We intend to protect our client's rights to the fullest extent possible by requesting that others do not directly or indirectly market [a] product which is substantially

identical to the "Headchair" headrest. In addition, we are requesting that products not be marketed directly or indirectly which by their design, trade dress and/or trademark would mislead consumers seeking to purchase [Sun's] "Headchair" products.

Letter from Scott R. Reid to Raymo Dallavecchia, Plaintiff's Exhibit NN, at 1–2.[7] This letter enclosed copies of the "Headchair" trademark registration certificate and "Headchair" packaging and advertising material.

A total of 152 cases of the "Heads–Up" product, containing 24 units each, or a total of 3,648 units, were shipped to B & E Sales between the end of May 1985 and November 1985. Meanwhile, on July 3, 1985, B & E's counsel sent a letter to Sun's counsel which stated:

Our client will certainly avoid use of any trademark for a head rest that might be considered confusingly similar to your registered mark "Headchair." We have no present basis for evaluating the rights that you may obtain on the pending patent application that you referred to, but if you would care to provide me with any details of the situation or advise me of the patent number when the patent issues, B & E will avoid purchases of any products that might violate your rights.

On August 14, 1985, in a letter to B & E Sales, Sun's counsel wrote:

I have enclosed copies of the allowed claims of Sun Global's U.S. Patent Application which pertain to their foldable headrest invention, referred to by its federally registered trademark of "Headchair." This patent is due to issue October 1, 1985.... I learned from [Sun] that B & E Sales had recently imported some 25,000 units from Taiwan for resale in the U.S.... We would appreciate it if you would advise [B & E Sales] ... to refrain from manufacturing or distributing products in the U.S. which may fall within or infringe the rights of [Sun].

The "allowed claims," to which the August 14 letter referred, were those of the '203 patent. This letter gave notice to B & E Sales of the anticipated issuance date of the patent, October 1, 1985. B & E Sales did not correspond with Sun, but placed orders for the production of 60,000 units of the "Heads–Up" product on November 19, 1985, and an additional 17,280 units on January 28, 1986, without notice to Sun.

No evidence was presented at trial with regard to Perry Drugs, except for testimony that the drug store chain purchased a single shipment of 4,580 units of "Heads–Up" in 1986.

### C.

■ In 1985, a Florida swimwear retailer, seeking a refund or credit on a "Headchair" order, shipped a broken headrest to Sun who recognized the product as a "Heads–Up" product. During the same year, a southern California swimwear retailer accused Sun of marketing a high-priced original product, as well as a low-priced imitation. Evidence that (1) B & E Sales headrests were returned as defective to Sun, and (2) retailers were confused and angered by what they believed to be "dumping" or mixing of original and imitation products on the market by the same producer are highly probative indications that the public was, and would have continued to be, confused as to the source of the two headrests while both were in the stream of commerce.

Sales of the "Headchair" plummeted to a fraction of their levels in early 1985 within months of the introduction of the "Heads–Up" product. During the second half of 1985, Sun sold 37,375 units of the "Headchair" (a drop of 76% from the sales figure

7. Sun's May 22 letter did not mention its October 1984 patent application. However, it did refer to a telephone conversation of May 16, 1985. This Court presumes, from the content of B & E Sales' reply of July 3, *see* discussion *infra,* that Sun referred in this telephone conversation to its pending patent application. *See also* Letter from B & E Sales Vice President Gregory L. Fike to the Company's patent counsel Allan Krass, June 4, 1985, Defendants' Exhibit 53 ("[Sun] indicated we should not be marketing similar type products due to their pending patent").

for the first half of 1985). Sun sold 58,141 units (a decline of 70% from 1985 sales) in 1986, and 64,302 units (a slight increase from 1986 sales) in 1987.

## II.

### A.

■ The patentability of an invention depends on its utility, novelty, and nonobviousness. 35 U.S.C. §§ 101, 102, 103. Once a patent is issued by the PTO, it is to be presumed valid. 35 U.S.C. § 282. "The burden of establishing invalidity ... rest[s] on the party asserting such invalidity." *Id.* That burden must be met by clear and convincing evidence. *SSIH Equipment, S.A. v. United States International Trade Commission,* 718 F.2d 365, 375 (Fed.Cir. 1983).

One who challenges the validity of a patent may sustain the burden of proof under section 282 by showing that the

> difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.

■ The section 103 determination of obviousness is a conclusion of law which is based on factual findings. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566–68 (Fed.Cir.1987).

■ In making its factual findings, a court must consider (1) the inventor's level of skill in the pertinent art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claimed invention, and (4) secondary considerations, which may serve as indicia of non-obviousness. *Graham v. John Deere Co.,* 383 U.S. at 17–18, 86 S.Ct. at 693–94.

■ Such secondary considerations include evidence of (a) commercial success due to the invention, (b) long felt but un-

solved needs for a given invention, (c) expressions of disbelief in a given invention by experts in the field, (d) failure of others to create the claimed invention, (e) copying of the invention in preference to prior art, and (f) other circumstantial evidence of nonobviousness. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d at 1569; *Windsurfing International, Inc., v. AMF, Inc.,* 782 F.2d 995, 999–1000 (Fed.Cir.1986), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed. 2d 565 (1986). *See also United States v. Adams,* 383 U.S. 39, 52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966) (disbelief by experts); *Johns–Manville Corp. v. Guardian Industries Corp.,* 586 F.Supp. 1034 (E.D.Mich. 1983), *aff'd,* 770 F.2d 178 (Fed.Cir.1985) (no mention of claimed invention in a crowded art).

■ To reach a proper conclusion on the obviousness question, a reviewing court must step into the shoes of the "average artisan" and examine the field as it stood at the time that the invention was made. In the light of all of the evidence, the factfinder must then determine whether the patent challenger has convincingly established that "the claimed invention as a whole would have been obvious at *that* time to *that* person." *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d at 1566 (emphasis in original). The Court cannot rely on hindsight or use the patent as a guide in evaluating prior art. *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 625 F.Supp. 343, 348 (E.D.Mich.1985), *aff'd,* 800 F.2d 1101, 1109 (Fed.Cir.1986); *Multi Fastener Corp. v. MacLean–Fogg Co.,* 572 F.Supp. 418, 427 (E.D.Mich.1983).

B & E Sales relies upon a combination of prior art references to support its argument that the claimed invention of the '203 patent is obvious. It contends that two prior art patents, the Frantz and Meyer patents,[8] disclose properties which are replicated in claim 1 of the '203 patent. B & E Sales argues that (1) the cross members of the file folder hanger frame in the Meyer patent disclose the same "stop connecting means" as those claimed in clause "o,"

---

**8.** *See* n. 6 *supra.*

and (2) the flexible design of the metal headrest frame in the Frantz patent discloses the "bowing" property claimed in clause "k."

■ However, the test for patentability is not whether the disparate elements of a number of prior art patents can be aggregated to equate with a claimed invention, but whether a patent application—when considered as a whole—is useful, novel, and less than obvious to an average artisan in view of the totality of prior art. *Graham v. John Deere Co.*, 383 U.S. at 13–14, 86 S.Ct. at 691–92. Although the synergistic effect of a "combination of old elements" is relevant when present, its "absence has no place in evaluating the evidence on obviousness." *Custom Accessories v. Jeffrey–Allan Industries*, 807 F.2d 955, 959–60 (Fed.Cir.1986). "The critical inquiry is whether 'there is something in the prior art as a whole *to suggest* the desirability, and thus the obviousness, of making the combination.'" *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1566 (Fed.Cir.1983) (emphasis in original).

■ The citation of the Meyer patent by the patent examiner in his denial of Sun's original application does not compel a finding that (1) the Meyer patent stood as an absolute bar to allowability, or (2) that the examiner erred in allowing Sun's amended application over the Meyer patent. The Court notes that the "offset X-shaped end frame members" and "side rails" of the support rack in Meyer are quite different in size, shape, construction and function from the frame members of the '203 patent.

In addition, B & E Sales claims that the Frantz patent, Defendants' Exhibit 13, which was apparently never considered by the examiner, would have compelled a finding that Sun's amended application was invalid for obviousness. It believes that the phrase "sprung over"[9] within the Frantz patent sets forth the essence of the

"bowing" property claimed in the '203 patent.

■ Under section 282, the introduction of prior art, which was not considered by the patent examiner, is a more persuasive challenge to patent validity if the art is more relevant than that considered by the examiner. *W.L. Gore & Associates, Inc., v. Garlock*, 721 F.2d 1540, 1553 (Fed.Cir. 1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *A.B. Karlstads Mekaniska Werkstad v. International Trade Commission*, 705 F.2d 1565 (Fed. Cir.1983).

This Court recognizes the relevance of the Frantz patent to the instant inquiry. However, the Court does not believe that Frantz, standing alone or in combination with the prior art patents which have been cited by the examiner, makes obvious the claims of the '203 patent. The headrest in Frantz requires hidden pins for assembly, whereas an important feature of the "Headchair" is that its visible "inwardly projecting keys" are integrated with the frames, which eliminates the need for additional parts in connection with the assembly of the device. The "pins" in the Frantz patent, unlike the "keys" of the '203 patent, appear to be intentionally held in position by pressure from the frames themselves. Furthermore, the "pins" are intended to fit *into* the holes, not *through* them as is taught in the '203 patent.

Finally, the "keys" of the '203 patent extend far enough from their frames that an assembly of the headrest requires "bowing" of at least twice the thickness of the frames—considerably more "bowing" than this Court believes an average artisan would deem to be necessary to assemble the Frantz device. Thus, clause "k" of the '203 patent teaches a much greater degree of frame flexibility than does Frantz even though an assembly of the devices appears to entail similar procedures.[10]

---

9. "One side portion of the outer link [*i.e.,* frame] is sprung over the end of the second pin after the first pin has been placed in position." Frantz Patent, Defendants' Exhibit 13, at 1, col. 2, line 60.

10. The Court must also recognize that the teachings of Frantz disclose a metal construction, and embody a much earlier technology than that of the '203 patent. Plastic and composite materials, and their vast possibilities for inte-

It must be recognized that a determination of obviousness by the patent examiner or by a reviewing court should include an inquiry into the level of ordinary skill in the art in question. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 453–54 (Fed.Cir.1985); *Kimberly–Clark Corp. v. Johnston*, 745 F.2d 1437, 1449–54 (Fed.Cir.1984). Factors that may be considered in determining what level of skill is "ordinary" in a given case include (a) the type of problems that tend to be encountered in art in question, (b) solutions which the prior art developed for those problems, (c) the rapidity with which innovations are made in the art, (d) the relative sophistication of the technology, and (e) the prevailing educational level of active workers in the field. Not all of these factors must be present in every case, and one or more of them may predominate. *Custom Accessories, Inc., v. Jeffrey–Allan Industries*, 807 F.2d at 962–63.

Here, the parties have stipulated, and this Court is satisfied, that the level of skill which prevails among inventors of foldable headrests is essentially that of the ordinary layman. It is undisputed that Younger and Fiedelak had no special training in industrial design, manufacturing, engineering, or the properties of materials. This Court does not consider it within the skill of an ordinary layman—even one who has been apprised of all pertinent prior art—to combine the teachings of the prior art at issue in this case in such a way as to make obvious the claims of the '203 patent.

For these and other reasons, this Court believes that the combined claims of the '203 patent, including the "bowing" claim of clause "k" and the "stop connecting means" claim of clause "o," are sufficiently different from the analogous claims of prior art that the subject matter of the '203 patent was not made obvious. The omission of the Frantz patent by the patent examiner in his enumeration of pertinent prior art does not change the opinion of

grated design, inexpensive manufacture and increased ease of use, were unknown at the time

this Court regarding the validity of the '203 patent. *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569 (Fed.Cir. 1984) (introduction of prior art not considered by examiner may help patent challenger meet persuasion burden, but does not change that burden).

### B.

Sun's original application was filed on October 16, 1984, and its amended application was filed on June 4, 1985. Because the "Headchair" was first marketed in December 1983, over a year before the filing of Sun's amended patent application, the amendment may be considered timely only if it is deemed to relate back to the date of the original submission. 35 U.S.C. § 112; *Ralston–Purina Co. v. Far–Mar–Co*, 772 F.2d 1570 (Fed.Cir.1985).

B & E Sales contends that if the addition of clause "k" of claim 1 was a sufficient change to make Sun's amended application allowable over the rejected original submission in the first instance, then clause "k" must have constituted a change in the import of the original claim so great as to defeat the relation back of the amendment.

This Court declines to hold that a patent examiner's decision to reject the original claim, and to allow a sunsequently filed amendment, effectively defines that amendment *ipse dixit* as a change which is too substantial to permit relation back to the original application. Different legal standards govern each of these questions.

The well-settled presumption of patent validity has already been addressed. The relation back of amended patent claims is a legal question that is independent of the examiner's judgments as to patentability.

Under 35 U.S.C. § 112,

[t]he specification shall contain a written description of the invention ... in such ... terms as to enable any person skilled in the art to which it pertains ... to make and use the same.

of the Frantz patent.

In *Ralston–Purina Co. v. Far–Mar–Co*, 772 F.2d at 1575–76, the Court held that claims within an amended application are entitled to the effective filing date of the original application if the parent application complies with the written description requirement of 35 U.S.C. § 112. In order to meet the standard of section 112, an amended claim must have "support" in, but not necessarily *in haec verba* identity of language with, an earlier claim for the same invention. *Railroad Dynamics, Inc., v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *Westphal v. Fawzi*, 666 F.2d 575 (Cust. & Pat.App.1981).

▮ The test is "whether the [original disclosure] reasonably conveys to the artisan that the inventor had possession at [the earlier] time of the later claimed subject matter." *In re Kaslow*, 707 F.2d 1366, 1375 (Fed.Cir.1983). Whether the description requirement has been met is a question of fact which must be determined on a case-by-case basis, *Ralston–Purina Co. v. Far–Mar–Co*, 772 F.2d at 1575, and is reviewable under the "clearly erroneous" standard. *In re Wilder*, 736 F.2d 1516, 1520 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985).

▮ After a thorough review of the physical, documentary and testimonial evidence which has been presented by both parties, this Court determines that Sun's original application contained sufficient "support" for the amended claims within the meaning of section 112. The degree of resiliency of the headrest frame in the original claim is simply that required to assemble the device, and thus is implicit in the original description of the assembly process. Indeed, given the one-piece design of the frames in the '203 patent, this Court fails to see how the device disclosed in that patent could be assembled if not as a result of a flexible characteristic of the frame material.

As B & E Sales has conceded, claim 2 of Sun's original patent application stated that "in the folded position of the headrest, applicable lateral and opposing forces permit free removal access and separation of the rectangular frames from each other." It is the judgment of this Court that the quoted passage would mean nothing to an average artisan other than that the frame members are intended to be capable of "bowing" for assembly.

Thus, Sun's amended claims, which were filed on June 4, 1985, must be evaluated as if they had been included with the original patent application that had been filed during the preceding year on October 16, 1984. Since the earlier date was within one year of the date of the first introduction of the "Headchair" into the stream of commerce, the "written description" requirement of section 112 poses no bar to the validity of the '203 patent.

Accordingly, this Court determines that U.S. Patent No. 4,544,203 is valid.

## III.

### A.

▮ A person, who asserts a patent right, must prove infringement by a preponderance of the evidence. *Hughes Aircraft Corp. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). A finding of "literal infringement" requires a showing that an accused device falls within the scope of the asserted claims as properly interpreted. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir.1984). Infringement under the doctrine of "equivalents" may be found upon a showing that the accused device "performs substantially the same function [as the patented device] in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

It is undisputed that the entirety of the '203 patent is literally readable on B & E Sales' "Heads–Up" product with the exception of clause "o" of claim 1. Thus, clause "o" is dispositive of the literal infringement issue in this case. The Court must now inquire whether clause "o" is readable on the "Heads–Up" product.

Clause "o" refers to the "stop connecting means" which the 203 patent incorporates

as a method of "limiting the travel of [the headrest] frames." The critical question is whether the "stop connecting means," which were described in clause "o," can be reasonably read (by an average artisan) to serve as the means by which the travel of the frames is stopped upon an opening or closing of the headrest, as claimed in the '203 patent.

B & E Sales contends that the travel of the frames of its headrest is not intended to be limited by the contact of the stops with each other, as reflected in Sun's clause "o," but rather merely by the tautness of the fabric panels on the headrest.

■ This Court believes that the dispute over whether the frame stops or the fabric panels account for the stopping of the "Heads–Up" frames can best be answered by a direct comparison of the two devices. Such a comparison is properly characterized as an "equivalents" analysis rather than a literal infringement inquiry since the point of reference is the "Headchair" device—not the words of the patent claim. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. at 608, 70 S.Ct. at 856.

■ This Court was presented with physical evidence at trial which clearly showed that when the B & E Sales product was used as intended, the travel of its frames was limited, in part, by contact between the opposing stops in the same manner as the travel of the Sun frames. Indeed, because the B & E Sales device is made of a softer plastic than that of the "Headchair," the frames of the "Heads–Up" product bow outward (and the stops come into contact) under less "squeezing" pressure than is true for the "Headchair." Thus, the stops have a *more* immediate role in limiting frame travel than do the stops of the "Headchair." Certainly, the "Heads–Up" stops have as much or more to do with limiting travel of the frames than do the fabric panels, which, B & E Sales contends, are the sole means of limiting the opening of its device.

■ Moreover, this Court cannot ignore the exactitude with which every physical detail of the "Heads–Up" product (including the frames with their shaped stops) resembles the corresponding features of the "Headchair." Even if the "Heads–Up" product was deliberately made with shortened fabric panels in an effort to reduce or eliminate contact between the stops as a means of limiting frame travel, such a comparatively minor alteration in an otherwise slavish copy cannot immunize the B & E Sales product from a claim of functional infringement.

Thus, because B & E Sales' frame design incorporated the complete functional equivalent of Sun's "stop connecting means," this Court finds that the "Heads–Up" product infringed the '203 patent under the doctrine of "equivalents."

B.

The Lanham Trademark Act of 1946 provides,

> Any person who shall, without the consent of the registrant, (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided ...

15 U.S.C. § 1114(1).

■ "A cause of action for trademark infringement arises when a trademark is used (1) without consent, (2) in connection with the sale of goods, (3) in a manner that is likely to cause confusion or to deceive purchasers as to the source or origin of the goods." *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 955 (S.D.N.Y. 1980), *citing Franchised Stores of New York v. Winter,* 394 F.2d 664, 668 (2d Cir.1968). A newcomer to the market has an affirmative duty to avoid confusion with a trademark that has been already adopted. *WSM, Inc., v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983).

It is undisputed that B & E Sales did not secure Sun's consent before adopting the

"Heads–Up" mark in connection with the sale of its headrest. Thus, whether the "Heads–Up" device infringed upon the "Headchair" trademark depends on the likelihood that purchasers of the "Heads–Up" product would be confused or misled as to its origin by its trademark.

■■■ Likelihood of consumer confusion in trademark cases is governed in this Circuit by the eight-factor test that was established in *Frisch's Restaurants, Inc., v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982). Those factors are (1) the strength of the plaintiff's mark, (2) the relatedness of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the likely degree of purchaser care, (7) the defendant's intent in selecting the mark, and (8) the likelihood of an expansion of the product lines.

■■■ Proof that an accused infringer intended to create public confusion is not critical to a finding of a likelihood of confusion under section 43(a). Likewise, liability under the statute does not depend on proof that retail customers were actually confused. *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194 (9th Cir. 1979). "Infringers rarely make absolute copies, and a side-by-side comparison is not the test.... It is sufficient when ... one having a general recollection of [plaintiff's] mark would likely on encountering [defendant's] assume that both emanate from the same source or connected sources." *WSM, Inc., v. Tennessee Sales Co.*, 709 F.2d at 1087. Thus, Sun's trademark infringement claim does not require proof that some identifiable percentage of "Headchair" customers saw or were likely to see the Sun product side by side with the B & E Sales product in the same store and experience confusion between the two headrests.

■■■ The trade dress of the "Headchair," *i.e.*, the overall design and appearance of the product's packages and displays as distinguished from the "Headchair" trademark *per se*, may be protected from infringement under the "likelihood of confusion" test of section 43(a) as long as the trade dress is (1) "nonfunctional," *i.e.*, not "essential to the use or purpose of the article or [affecting] the cost or quality of the article," *Inwood Laboratories, Inc. v. Ives Laboratories*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982), or (2) endowed with a "secondary meaning" in the marketplace, *i.e.*, a meaning which more closely connects the trade dress in the public mind with a unique, even if anonymous, producer or source, than with the product itself. *20th Century Wear, Inc. v. Sanmark Stardust, Inc.*, 747 F.2d 81, 93 (2d Cir.1984); *Westward Co. v. Gem Products, Inc.*, 570 F.Supp. 943, 950–51 (E.D.Mich.1984) (Feikens, C.J.). Secondary meaning need not be proven where trade dress is non-functional. *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702–03 (5th Cir.1981).

■■■ This Court finds that the "Headchair" trade dress, although it greatly aided the product's sales, was essentially arbitrary and non-functional. Sun could have marketed the product with one of a number of different packages and display designs. Moreover, the "Headchair" package was not essential to the purpose or use of the headrest itself. Thus, the Court need not determine the nature of the "secondary meaning" to the "Headchair" trademark and trade dress in order to find B & E Sales liable for an infringement under section 43(a) of the Lanham Act.[11]

The similarity of the "Headchair" and "Heads–Up" trademarks and trade dress persuades this Court that confusion between the two products was highly likely. Both tradenames are distinctive words, one a neologism and the other a *double entendre*, which make clever and humorous use of the word "head" to specify or allude to the use of the product.

The two packages are of identical size and shape (as are the products). These packages are made from paper of comparable thickness, with similar glossy coatings,

---

**11.** The Court notes its firm belief that the "Headchair" mark was a strong one, which had acquired a "secondary meaning" before B & E Sales' infringement began.

and adorned with virtually identical close-up photographs of women clad in scant, high-fashion one-piece swimsuits, wearing sunglasses and reclining upon headrests.

■■■ The graphic design of the "Heads-Up" package is a clear if inexact imitation of the "Headchair" box and display. The packages are particularly similar with regard to the placement, type style and content of the slogan, "The heads up way to take it easy," beneath the name "Headchair" on the Sun package, and the slogan, "A Great Lift to Comfort," on the "Heads-Up" package.[12] The ends of both packages are made without closures (a feature which permits removal of the contents at the point of purchase without damaging the package), and the packages' end cutouts are shaped in an identical manner.

On the basis of the record, it is evident to this Court that (1) the "Headchair" mark achieved some notoriety in the North American personal accessories market, and (2) the introduction of "Heads-Up" caused such confusion in the marketplace that the market for the Sun product was virtually destroyed in a matter of months. The conclusion is inescapable that B & E Sales infringed Sun's "Headchair" trademark and trade dress within the meaning of section 43(a).

### C.

Under the Michigan common law of unfair competition, an action may be brought against

the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor. The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of another, and thereby appropriate to himself the value of

the reputation which the other has acquired for his own product or merchandise.

*Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*, 338 F.Supp. 762, 767 (E.D.Mich.1972), *aff'd*, 473 F.2d 910 (6th Cir.1973).

The infringer's intent to deceive need not be proven by direct evidence, but it "may be inferred from circumstances and will be presumed where the resemblance is patent and the probability of confusion obvious." *Socony–Vacuum Oil Co. v. Rosen*, 108 F.2d 632, 636 (6th Cir.1940).

■■■ This Court heard testimony that B & E Sales had not seen the "Headchair" or its packaging when it designed the "Heads–Up" package in April 1985. The Court finds such testimony not to be credible. The similarity of the two packages in every detail is so striking that this Court does not believe the resemblance to have been accidental. Moreover, this Court believes that consumer confusion between the two products was highly probable on the basis of these packages. Finally, this Court concludes that B & E Sales must be held liable for unfair competition under Michigan law.

### IV.

#### A.

Under 35 U.S.C. § 284, damages in patent infringement cases are to be determined as follows:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

In *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056 (Fed.Cir.1983), the Court noted,

The question to be asked in determining damages is 'how much had the Patent Holder ... suffered by the infringe-

---

**12.** Although the Sun slogan is not a registered trademark, the similarities between the slogans must nevertheless be considered as evidence on the likelihood of confusion issue.

382

ment.... had the infringer not infringed, what would the Patent Holder have made?' ... In proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability.

*Id.* at 1065, *quoting Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964).

 In its determination of the amount of damages, the Court must resolve all doubts against the infringer. *Bio–Rad Laboratories v. Nicolet Instrument Corp.,* 739 F.2d 604 (Fed.Cir.1984). Demand for the patented product may be shown by the relative quantities of the patent owner's and infringer's sales. *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552 (Fed.Cir.1984).

 B & E Sales argues that any award of damages to Sun should be based only upon a reasonable royalty for its use of the subject matter of the '203 patent. B & E Sales indicates that since its "Heads–Up" profits after the patent grant were less than $30,000, any royalty award to Sun should be between two and ten pecent of that amount.

B & E Sales bases its argument for royalties on two basic objections to Sun's lost profits claim. First, the "Headchair" was merely a "fad" or "novelty" item, and its sales would hardly have met Sun's expectations even on a short term basis regardless of the presence of B & E Sales' product on the market. Second, the "Headchair" and "Heads–Up" products were sold at greatly different prices, to entirely different retailers, and ultimately to different sets of consumers, such that a consumer would be extremely unlikely to see both products in such a way as to have a choice between them.

B & E Sales claims that it stopped reordering the "Heads–Up" product in 1986, in ostensible effort to prove that foldable headrests were "fad" items with a short sales life expectancy. Contrary to B & E Sales' contention, this evidence does not compel such a conclusion. It is equally plausible that "Heads–Up" sales were slow because the product was unappealing to consumers in its own right. Notwithstanding B & E Sales' suggestions, the fact that an imitation sells poorly does not necessarily reflect on the saleability of the original.

Conversely, the more expensive design, finer materials, more careful manufacture, higher pricing, and more selective marketing which Sun used in selling the "Headchair" had the effect of aiming the product at relatively affluent markets. This strategy may have been more effective in the selling of a foldable headrest device than the "downscale" strategy that had been implemented by B & E Sales. A foldable headrest is a leisure item, which requires some measure of consumer trust since the purchaser presumably demands security for his reclining head. Thus, to design and market the product with relatively discerning, discretionary consumers in mind, as Sun chose to do, may have resulted in a degree of success which was impossible for the B & E Sales product.

This Court heard testimony from Douglas MacLachlin, a professor of marketing at the University of Washington, who presented his projections of the future prospects for the "Headchair" product in a marketplace without "Heads–Up." He expressed the belief that the "Headchair" was more than a "fad" or a "novelty" item because its functional purpose, and the clarity with which that purpose could be conveyed to consumers, gave the product a sales life expectancy substantially beyond that of any "fad" item.

In support of his theory, MacLachlin cited the 416% growth in "Headchair" sales in the product's first half-year, and suggested that his forecasts of 10% and smaller annual growth in the product's sales between 1985 and mid–1992, with no sales projected thereafter, were "conservative."[13]

13. MacLachlin described in detail the methods and assumptions that he had used to project the sales and profits for the "Headchair" in future years, including market "saturation," seasonal adjustments in consumer demand, changes in cost of production and distribution, and declining average profit per unit. His report, Plaintiff's Exhibit PP, was admitted into evi-

B & E Sales did not present any projections of its own, or produce any evidence which would counter MacLachlin's projections other than its own marketing expert, J. Patrick Kelly, a professor of marketing at Wayne State University, who opined that the "Headchair" product was merely a "fad" item and could hardly be expected to enjoy sales of the magnitude and duration which had been claimed by Sun.[14]

The Court notes that Kelly had "no opinion" as to what effect the introduction of the "Heads–Up" product might have had on the "Headchair" market. Kelly admitted that many products with high early sales attainments, such as hot air popcorn poppers, "crock pots," and disposable razors, remained successful sellers long beyond the normal life expectancy for a "fad" item.[15]

Whatever a "fad" may be, it is clear from the record that the distinction between a "fad" and a non-"fad" is a matter of degree. Longevity in the marketplace, likelihood of repeat purchases by the same buyers over time, and other variables in the "novelty" market are continuous and not precipitous functions. As discussed by both sides during the trial, the "hula hoop," a famous toy which was originally marketed as a "fad," has continued to sell well for over a generation. The "Frisbee" disc is another product whose sustained selling power over many years transcends its early success as a novelty.

Neither party offered conclusive evidence on the question of the "perceived value" of the "Headchair," and the impact on that value which the lower-priced "Heads–Up" product might have exerted. However, the Court is not persuaded that a prospective headrest buyer who decided against purchasing the product at the higher price would necessarily choose against it at the lower price.

In any event, this Court is not convinced by B & E Sales' suggestion that consumers, who express an interest in foldable headrests on a "whim" basis or otherwise, would be receptive to the item only when found in the "upscale" outlets where Sun concentrated its sales efforts, and would never buy a "Headchair," at whatever price, if they encountered the product in a discount store.

The Court also rejects B & E Sales' contention that only extensive advertising could have increased "Headchair" sales beyond the modest levels which they reached during the second half of 1985 and thereafter. It is uncontroverted that, although Sun purchased very little commercial advertising during the first year in which the "Headchair" was on the market, Sun's product received considerable nationwide exposure in the print and broadcast media. This attention clearly resulted from the journalists' interest in the "Headchair" as a story. The Court finds that the paid advertising which Sun purchased did not significantly contribute to the enormous initial success of the "Headchair."

For these reasons, the Court concludes that the effect of B & E Sales' actions far exceeds the extent of its profits from the sale of "Heads–Up." Therefore, a royalty-based recovery would be utterly inadequate to compensate Sun for its loss. Hence, the only proper measure of damages in this case is Sun's lost profits.

### B.

As described in *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d at 1065, lost profits in patent cases are properly

---

dence after B & E Sales had a full opportunity to attack its premises, methods and results.

**14.** Kelly also opined that foldable headrest purchasers were "impulse" buyers, *i.e.*, consumers who purchase a product on a momentary whim after they have entered a store. On the basis of this opinion, B & E Sales argues that it would have been unlikely for a potential headrest buyer to be dissuaded from the purchase of a "Headchair" by the sight of the cheaper "Heads–

Up," given that in no single store were both products available for sale.

**15.** When asked to cite examples of "novelty" and "non-novelty" items in its distribution inventory, B & E Sales asserted that a car wash mitt was a "non-novelty" item, whereas a digital clock with compass for automotive use was a "novelty" item. This Court fails to appreciate, and declines to credit, such fine distinctions.

calculated as the sum of (1) profits from the patentee's potential sales which were lost to actual sales by the infringer, (2) profits lost as a consequence of price cuts that are required to overcome the infringer's competition, and (3) profits from projected lost sales, excluding sales which were lost because of the infringer's actual sales.[16]

As will be more fully set forth below, the Court accepts Douglas MacLachlin's projections as to the profits which Sun would have earned had the "Headchair" remained in the marketplace continuously. With regard to the other two *Lam* damage elements, the Court notes that B & E Sales sold at least 77,640 units of the "Heads–Up" product after the '203 patent was issued on October 1, 1985. Sun's average pre-infringement profit was $1.56 per unit. The profit which Sun lost as a result of B & E Sales' actual sales amounts to 77,640 units multiplied by $1.56, or $121,118.

Sun sold approximately 175,000 units of the "Headchair" after its patent was issued in October 1985 at an average profit of $0.79 per unit, resulting in an average reduced profit of $0.77 per unit from $1.56. The number of units sold (175,000), multiplied by the average reduced profit per unit ($0.77), yields a reduction in Sun profits which totals $134,750.

This Court recognizes that "judgmental forecasting"[17] is far from an infallible science. However, the Court has examined MacLachlin's report with care, and is satisfied that his estimates of future "Headchair" sales are conservative. The Court is persuaded that the "Headchair" was not merely a "fad" item, and that the MacLachlin report is the best available estimate of the sales and earnings which Sun would have realized if the "Headchair" project had not been interrupted.

Accordingly, the Court adopts the projections of the MacLachlin report, and finds that Sun could have sold 146,330 units of the "Headchair" during the second half of 1985; 396,555 units during 1986; 478,811 units during 1987; 568,436 units during 1988; 652,145 units during 1989; 720,817 units during 1990; 767,044 units during 1991; and 471,165 during the first half of 1992.

The Court also adopts the projections of the MacLachlin report concerning Sun's average profit per unit and the time value of the company's lost profits for each year projected.[18]

### C.

B & E Sales admits that it possessed specimens of the "Headchair" product as early as April 1985. In June 1985, Sun filed its amended patent application, which was approved in October 1985. This Court concludes, from the whole of the evidence of record, that B & E Sales intended to distribute a product which copied the "Headchair" in every detail.

However, such a finding does not of itself compel the conclusion that B & E Sales committed willful infringement within the meaning of 35 U.S.C. §§ 284 and 285, under which a willful wrongdoer is liable for enhanced damages and attorney's fees to the prevailing patentee.

 Upon receipt of actual notice of another's patent rights, a potential infringer has an affirmative duty of due care to determine whether he is infringing. *Bott*

---

**16.** For its proofs of damages in the third category, the plaintiff in *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d at 1067–68, demonstrated its increase in sales prior to the onset of infringement, and projected that rate of growth through the period of infringement. It then subtracted actual sales from projected sales on the basis of the pre-infringement growth rate. The result was projected lost sales, which was further reduced by deducting sales lost because of actual sales by the infringer.

The *Lam* Court found this formulation to be neither remote nor speculative. Subsequent decisions have followed this formula. *See, e.g., King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 864 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

**17.** This is the method that was used by Sun's marketing expert to predict the life cycle of the "Headchair."

**18.** These figures do not represent the final determination of damages by this Court, but require certain adjustments as set forth *infra*.

*v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986). This affirmative duty normally includes the obtaining of competent legal advice before engaging in a potentially infringing activity, although the failure to obtain legal advice does not mandate a finding of willful infringement. *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109 (Fed.Cir.1986). Other factors to be considered include the presence or absence of deliberate copying, and the infringer's behavior during the litigation. *Bott v. Four Star Corp.* 807 F.2d at 1572.

No "hard and fast rule *per se*" governs the determination of willfulness. *Rolls–Royce v. GTE Valeron Corp.*, 800 F.2d at 1108. Rather, the trier of fact must consider the totality of the circumstances in deciding whether a reasonable person would prudently have conducted his affairs with confidence that a court would hold the patent enforceable. *Central Soya Co. v. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir. 1983).

Sun elicited testimony at trial that no search of prior art had been performed on B & E Sales' behalf as late as January 1987. Sun's implicit argument is that if no search was performed until after the instant litigation began, and if the key prior art patent upon which B & E Sales based its invalidity argument at trial was not discovered before that time, then the opinion of B & E Sales' patent counsel, which was rendered in November 1985, must not have been based on any prior art patent which might have tainted the validity of the '203 patent.

The evidence indicates that B & E Sales (1) acquired and began distributing the "Heads–Up" product early in 1985, (2) consulted a patent attorney at a later time during that year, and (3) continued its marketing of the "Heads–Up" product through the balance of 1985 and into 1986 in partial reliance on the patent attorney's advice.[19]

It should be noted that Sun successfully fought to preclude the admission of the document which B & E Sales represented to be an opinion letter to its officers from patent counsel. Nevertheless, even assuming a well-supported suggestion that the legal opinion offered was based on inadequate preparation, this Court cannot conclude that the client's activities in reliance on such an opinion amounted to willful infringement. Such a finding would presuppose a determination that (a) B & E Sales' counsel was incompetent as a matter of law and B & E Sales should have known this fact, or (b) the attorney and his client had colluded in the infringement in this case. No evidence has been adduced to support either one of these notions.

**D.**

There can be no liability for patent infringement until a patent has been issued. *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 666 (10th Cir.1980). Although the deliberate copying of an invention which is later granted a valid patent may be evidence of the willfulness of infringement for damage purposes, the behavior of B & E Sales which bears on the patent damages question is the infringement, if any, which took place after the '203 patent was issued on October 1, 1985. Thus, Sun may recover lost profits on its patent claim only for sales which, with reasonable probability, would have been made after that date.

With regard to trademark infringement, Sun's situation is rather different. Under section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), damages are recoverable for the infringement of registered and unregistered trademarks alike as long as the "likelihood of confusion" test of section 43(a) is satisfied. *WSM, Inc. v. Wheeler Media Services, Inc.*, 810 F.2d 113, 116 (6th Cir. 1987); *accord, Rickard v. Auto Publisher, Inc.*, 735 F.2d 450 (11th Cir.1984).[20]

**19.** No evidence was admitted into the record at trial concerning the content of counsel's advice to B & E Sales about the '203 patent. B & E Sales' counsel urges that he forwarded a written opinion to his client "in November of 1985." Defendants' Post–Trial Brief at 10.

**20.** Some courts have held that the remedies of section 35 are only available to holders of reg-

Furthermore, section 35(a) vests the Court with discretion, in cases of willful infringement of trademark rights, to increase a damage award by any amount up to three times the actual damages that are proven at trial.[21] "Willful infringement" in the trademark context is hardly different from its counterpart in the patent context. However, in the instant case, this Court concludes that the infringement of the "Headchair" trademark was willful even though it has found the infringement of the '203 patent to be less than willful.

No evidence was presented that B & E Sales sought the advice of counsel concerning the possibility that its "Heads–Up" mark infringed the "Headchair" trademark. B & E Sales witnesses testified only that the company proceeded with orders for the product in reliance on the opinion of patent counsel. The only bits of evidence which bore upon the question of willful trademark infringement were a few conclusory assertions by B & E Sales witnesses to the effect that "Heads–Up" was a name chosen to avoid infringement.

This Court finds such testimony lacking in credibility. The "Heads–Up" name, package and product were arrestingly close copies of the "Headchair" name, package, and product. Sun chose and registered the "Headchair" trademark before B & E Sales designed its package or began distribution of its headrest. It is inconceivable to this Court that the "Heads–Up" mark was chosen with a motive other than to exploit whatever association Sun had already created in the public mind between the "Headchair" name and its foldable headrest product. These findings compel a determination that B & E Sales willfully infringed the "Headchair" trademark within the meaning of section 1117(a).

Accordingly, the Court assesses damages in the amount of three times B & E Sales' admitted "Heads–Up" profits of $29,000, or $87,000, and twice the total amount of Sun's anticipated profits for each half-year of the MacLachlin projections, from the first half of 1985 through the first half of 1992.

Whatever lost profits damages are not recoverable for patent infringement are deemed to flow from B & E Sales' willful infringement of the "Headchair" trademark, which is a separate and independent statutory wrong. This award shall be adjusted as provided below.

E.

This Court agrees with Sun that the sales projections of the MacLachlin report were conservative, and that Sun would have sold at least the number of headrests which were projected to be sold through mid–1992 (and continued to sell them beyond that time) if the "Headchair" enterprise had continued unimpeded by B & E Sales' infringement.

The Court believes that the acts of B & E Sales permanently impaired "Headchair" sales prospects for several reasons. Those acts resulted in a near-complete interruption of the "Headchair" sales, a breach in the relationship of trust which Sun had

---

istered trademarks, and that no damages may be recovered if the acts which gave rise to the infringement claim occurred before the trademark was registered with the PTO. *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.,* 592 F.Supp. 127 (E.D.Pa.1984), *citing City Messenger of Hollywood v. City Bonded Messenger Service,* 254 F.2d 531, 535 (7th Cir.), *cert. denied,* 358 U.S. 827, 79 S.Ct. 45, 3 L.Ed.2d 66 (1958).

However, there is no need to reach this question in the instant case, because the "Headchair" trademark was duly registered with the PTO on March 19, 1985, before B & E Sales designed the "Heads–Up" packaging or began sales of the "Heads–Up" product. Thus, the date of registration of the "Headchair" mark poses no bar to Sun's recovery of damages for trademark infringement.

**21.** Under 15 U.S.C. § 1117(b), treble damages are mandated, not merely permitted, for the use of an actual "counterfeit mark." Such a mark must be "identical with, or substantially indistinguishable from," a mark used by a party seeking such damages. 15 U.S.C. § 1116(d)(1)(B)(ii). The "counterfeit mark" standard is quite different from the "likelihood of confusion" test for general infringement under section 43(a). *Frisch's Restaurants v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d at 648. This Court does not believe that B & E Sales' infringement satisfies the "counterfeit mark" standard of section 1117(b).

established with its nationwide network of independent sales agents, and a drastic reversal of what had been a phenomenal early commercial success. The damage to Sun's business caused by B & E Sales' infringements will likely never be fully repaired.

However, Professor MacLachlin's projections apparently assumed the permanent and total cessation of "Headchair" sales, even though no evidence was presented that sales could not be resumed once the patent and trademark protections were given effect by a court. Along with testimony relating to the perennial consumer appeal of the device, there was testimony that the "Headchair" project was more than "dormant," and that at least one sales agent was actively engaged in marketing the "Headchair" through the date of trial in this cause.

Thus, the Court must recognize that some potential still exists for future sales of the "Headchair" despite the past infringement of its patent and trademark. To the extent that the product is a functional personal accessory and not a mere "fad," as the Court has already found, the appeal of the headrest to consumers may reasonably be expected to continue.

It seems apparent that the 1985 wave of media interest in the "Headchair" cannot be expected to duplicate itself when the product reappears on the market after a hiatus such as the present one. Moreover, it will not be easy for Sun to reestablish the relationships that it had developed in the marketplace before B & E Sales' infringement began. This Court believes that the sales momentum and business goodwill which flowed from Sun's successful first year has, to a great extent, been irreparably lost. Therefore, Sun cannot be reasonably expected to recover more than half of the sales volume of the MacLachlin

projections for any future year that was listed in the report.

The Lanham Act requires this Court to exercise its equitable powers in the award of damages for trademark infringement. 15 U.S.C. § 1117(a). In the interest of justice, but mindful that its estimates may be less than fully accurate, the Court determines that, should Sun begin the reintroduction of the "Headchair" into the market in the first half of 1989, the company stands to realize at least (a) 10% of its projected sales for the second half of 1989, (b) 20% of its projected sales for the first half of 1990, (c) 30% of its projected sales for the second half of 1990, (d) 40% of its projected sales for the first half of 1991, and (e) 50% of its projected sales during each half-year thereafter through the last half-year of the MacLachlin projections. *Lam, Inc. v. Johns–Manville Corp.,* 718 F.2d at 1065, *citing Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (damages must "not be determined by mere speculation or guess, [but] it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference").

■■■ Because the Court believes that Sun can achieve at least this measure of success with a reintroduced "Headchair," Sun's lost profits damages must be discounted to the extent that has been set forth above in order to avoid an unjust enrichment. Accordingly, the Court sets Sun's lost profits damages at the following amounts: (1) the figures cited as "lost profits" in the MacLachlin report for all half-years from the second half of 1985 through the second half of 1988, $336,175 for the first half of 1989, $224,062 for the second half of 1989, $273,203 for the first half of 1990, $165,779 for the second half of 1990, $194,820 for the first half of 1991, $130,666 for the second half of 1991, and $188,466 for the first half of 1992.[22]

**22.** These figures were computed by subtracting the "reintroduction discount" by the Court from the "seasonalized predicted sales" figures of the MacLachlin report, and then proceeding from that sum to a lost profits figure for each half-year as the report provides.

The Court directs that the "present value of lost profits" be calculated as was done in the MacLachlin report, using the revised lost profits figures provided. The resulting sums are to be multiplied as provided in Part IV(D) of this Order, and then added to the figures in Part

Prejudgment interest should be added to these figures. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983) ("prejudgment interest should be awarded under [35 U.S.C.] 284 absent some justification for withholding such an award"). The patent infringement in the instant case began on October 1, 1985, the date on which the '203 patent was issued. Three years and one month have elapsed since that date. The Court orders that 10% simple interest per annum be used to calculate the prejudgment interest in this case.

### F.

Prevailing plaintiffs in patent and trademark infringement cases may be awarded reasonable attorney's fees only in exceptional cases. 35 U.S.C. § 285; 15 U.S.C. § 1117(a). In patent cases, "a finding that infringement was willful and deliberate" justifies an award of fees under this standard. *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d at 667.

■■■ Because this Court finds that B & E Sales' infringement of the '203 patent was less than willful, Sun may not receive attorney's fees for its counsel's services in the patent portion of this action. However, the Court finds that B & E Sales' infringement of the "Headchair" trademark and trade dress was sufficiently egregious and "exceptional" within the meaning of section 1117(a) to justify an award of attorney's fees for the work of Sun's counsel on the trademark portion of this litigation.

"Under section 35 of the Lanham Act, ... a court in 'exceptional cases may award attorney fees to the prevailing party.' Although the precise definition of the term 'exceptional cases' is uncertain, the legislative history clearly suggests that it would involve cases in which the infringement was malicious, fraudulent, willful, or deliberate." *Hindu Incense v. Meadows*, 692 F.2d 1048, 1051 (6th Cir.1982), *citing* S.Rep. No. 93-1400, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7132, 7133. *See also Vuitton Et*

IV(B) of this Order as damages based on B & E

*Fils, S.A. v. Crown Handbags, Inc.*, 492 F.Supp. 1071, 1078-79 (S.D.N.Y.1979), *aff'd without opinion*, 622 F.2d 577 (2d Cir. 1980) (a deliberate or willful violation of the Lanham Act makes the case exceptional and accords a right to attorneys' fees in the discretion of the court).

In *Machinery Corp. of America v. Gullfiber AB*, 774 F.2d 467, 470 (Fed.Cir.1985), the Court held that a prevailing party who seeks attorney fees in trademark infringement litigation must prove the exceptional nature of the case by clear and convincing evidence.

In the instant case, B & E Sales copied every detail of the innovative "Headchair" package with only a few modifications. Moreover, this Court is convinced that B & E Sales used an actual specimen of the "Headchair" in the promotional photographs on its "Heads-Up" package. Such conduct is no less than the "malicious, fraudulent, willful, or deliberate" misbehavior which Congress intended to sanction by providing for the award of attorney's fees. Accordingly, B & E Sales must pay Sun's reasonable attorney's fees for work on the trademark portion of the instant litigation. Within thirty (30) days of the date of this Order, or within thirty (30) days after the lifting of the stay of proceedings which was imposed by the Bankruptcy Court pursuant to B & E Sales' petition for relief under Chapter 11 of the Bankruptcy Code, whichever is longer, Sun shall submit a schedule and affidavit of reasonable fees for only that portion of its counsel's work. B & E Sales shall have a period of ten (10) days after Sun's submission within which to register any objections that it may have to Sun's requested fees.

### G.

■■■ The only evidence against Perry was its purchase of 4,580 units of "Heads-Up" from B & E Sales in 1986. There is no evidence to suggest that Perry sold the "Heads-Up" units which it had purchased. Therefore, this Court concludes that Sun has failed to meet its burden of proof as to

Sales' "Heads-Up" profits.

the liability of Perry for patent or trademark infringement.

Moreover, this Court has already provided for compensation to Sun on the basis of B & E Sales' activities. Thus, to award additional damages to Sun based on Perry's purchases from B & E Sales would allow double recovery to the extent of such award.

Finally, there is no evidence that Perry was aware of Sun's patent or trademark rights when it purchased the "Heads–Up" product from B & E Sales. Thus, an award of enhanced damages or attorney's fees against Perry is unwarranted.

Accordingly, Perry must be dismissed from the action.

IT IS SO ORDERED.